USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 97-1053 ROBERT B. REICH, ETC., Plaintiff - Appellant, v. JOHN ALDEN LIFE INSURANCE COMPANY, Defendant - Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nathaniel M. Gorton, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Lagueux,* District Judge. ______________ _____________________ Anne Payne Fugett, Attorney, with whom J. Davitt McAteer, __________________ __________________ Acting Solicitor of Labor, Steven J. Mandel, Associate Solicitor, ________________ and William J. Stone, Counsel for Appellate Litigation, U.S. _________________ Department of Labor, were on brief for appellant. William J. Kilberg, with whom Eugene Scalia and Gibson, Dunn __________________ _____________ ____________ & Crutcher LLP were on brief for appellee. ______________ ____________________ September 18, 1997 ____________________  ____________________ * Of the District of Rhode Island, sitting by designation. LAGUEUX, District Judge. In this appeal, the Court is LAGUEUX, District Judge. ______________ asked to decide whether certain employees of the John Alden Life Insurance Company ("John Alden") are exempt from the overtime pay provisions of the Fair Labor Standards Act, 29 U.S.C. 201-219 ("FLSA" or the "Act"). The particular question before the Court concerns whether the employees at issue, known as marketing representatives or marketing specialists (collectively, the "marketing representatives"), fall within the "administrative employee" exemption, 29 U.S.C. 213(a)(1), which provides that "any employee employed in a bona fide executive, administrative, or professional capacity" is excluded from the Act's overtime pay and recordkeeping provisions. The United States Secretary of Labor ("the Secretary") filed this action against John Alden on May 4, 1995, seeking to enjoin the company from violating the FLSA's overtime and recordkeeping requirements with respect to the marketing representatives. The parties submitted the case to the district court on stipulated facts and cross-motions for summary judgment, under Rule 56 of the Federal Rules of Civil Procedure. In a Memorandum and Order dated October 8, 1996, Judge Gorton found that the marketing representatives qualified as "administrative employees" under 29 U.S.C. 213(a)(1), and therefore denied the Secretary's motion and granted summary judgment in favor of John Alden. See Reich v. John Alden Life Ins. Co., 940 F. Supp. 418, ___ _____ ________________________ 421-24 (D. Mass. 1996). For the reasons that follow, we affirm. -2- I. FACTUAL BACKGROUND I. FACTUAL BACKGROUND As noted above, the parties submitted this case to the district court on stipulated facts, and Judge Gorton provides a detailed account of the parties' stipulation in his memorandum. See id. at 419-20. Thus, for the purposes of this appeal the ___ ___ Court needs only to highlight those facts that are most relevant to the issue presented for review. John Alden is a Florida-based company that operates in several states, including Massachusetts, where it maintains an office in Westborough. The company designs, creates, and sells various types of insurance products; its customers are typically businesses, who purchase group coverage on behalf of their employees. As is the common practice in the industry, John Alden does not sell its products through direct contacts with customers, but instead relies on licensed independent insurance agents ("agents") to provide its customer base. In general, an agent will recommend a variety of insurance products, including John Alden products and those of its competitors, to a prospective end-purchaser. When a customer decides to purchase a John Alden product, the agent acts as an intermediary between the company and the end-purchaser to achieve completion of the transaction. -3- The primary duty of the marketing representatives -- the employees at issue here1 -- is to cultivate this independent agent sales force, and, thereby, ultimately to increase sales of John Alden products. To this end, the marketing representatives maintain constant contact with agents. Marketing representatives do not "share" agents with one another; instead, each keeps a list or "deck" of agents with whom he or she is in contact. The typical deck consists of 500-600 agents, and marketing representatives continually cull their decks to maintain an active agent base. As an agent's primary contact with John Alden, a marketing representative is responsible for keeping his or her agents up to date on all aspects of John Alden's product line. For instance, the marketing representatives keep their agents apprised of any new products or product combinations available from John Alden, and make their agents aware of any changes in the pricing of the company's products. The marketing representatives also discuss how John Alden's products might meet the particular needs of an agent's current or prospective customers, and advise agents as to which John Alden products to market against competing products. Often, they help their agents develop proposals for bidding on new business by recommending the appropriate combination of John Alden products to fit a prospective customer's needs. To further educate their agents,  ____________________ 1 All of the marketing representatives at issue in this case work in John Alden's Westborough, Massachusetts office. -4- marketing representatives sometimes pass along articles about the company and/or its competitors, or give small-group presentations about John Alden's products. In dealing with agents, the marketing representatives do not use prepared scripts. Further, although they receive guidance about suggested points of emphasis during an initial training period and at weekly sales meetings, these employees must decide for themselves which products to emphasize to a particular agent, and which of their agents to contact on a given day. Thus, to make these decisions the marketing representatives must rely on their own knowledge of their agent decks and the specific needs of their agents' customers. Consequently, they spend most of their time (approximately seven hours a day) on the phone with agents. While most of these calls are made to agents with whom they are already familiar -- to advise agents of new product developments, discuss current customer needs, or follow up on outstanding sales proposals -- they also make some "cold calls" to agents in the deck with whom they are unfamiliar, both to acquaint the agents with John Alden and to learn about each agent's customer base. When a customer ultimately decides to purchase a John Alden product, a marketing representative acts as a conduit between the agent and prospective purchaser, on the one hand, and John Alden's underwriting department, on the other. Generally, the marketing representative sends an application to the agent, who meets with the customer to complete the necessary paperwork; -5- the agent then returns the completed application to the marketing representative, who in turn forwards it to the underwriting department. While the application is pending, the marketing representative will sometimes gather the additional information needed in the approval process, such as medical records, or arrange medical tests for the purchasers' employees where such information is lacking. Beyond this, however, the marketing representatives play no further role in the purchase transaction. Thus, they do not set or negotiate prices or terms of insurance, nor do they have any authority to approve or deny an application, as this is done solely by the underwriting department. Typically, marketing representatives are college graduates with two to six years of marketing experience. An initial period of training at John Alden is supplemented with both formal and informal instruction from supervisors and more senior marketing representatives throughout their tenure at the company. They also attend weekly sales meetings with a District Manager, where they learn about new products and exchange information about sales techniques they have found to be effective. At these sales meetings, the marketing representatives also pass along any information they might have received from agents -- for instance, information concerning a competitor's new products or prices, or about which new products are selling well -- that might be helpful to the company in designing new products. -6- The marketing representatives work five days a week, typically working ten-hour days with a one-hour lunch break.2 As noted earlier, they spend most of their time on the phone with agents, with the remaining time spent completing and reviewing paperwork related to these agent contacts. On average, a first- year marketing representative will generate approximately $1.5 million in sales annually for the company, while a more experienced representative will be credited with approximately $3 million in sales each year. The average annual compensation for a marketing representative is $50,000, and more senior representatives can earn as much as $75,000. In addition to a base salary of $34,000 to $37,000, these employees earn quarterly incentive and bonus pay based on the number, value, and profit performance of the policies issued by the agents in their agent decks. To further encourage sales, the company sets a quarterly sales goal for each marketing representative; anyone who fails to meet this benchmark receives further training and counseling, and ultimately risks termination if this failure persists for two or more consecutive quarters. II. PROCEDURAL BACKGROUND II. PROCEDURAL BACKGROUND On May 4, 1995, the Secretary commenced this action against John Alden pursuant to section 17 of the FLSA, 29 U.S.C. 217, seeking to enjoin the company from violating the overtime and recordkeeping provisions of the Act, 29 U.S.C. 207 and  ____________________ 2 Although John Alden does not maintain records of the hours worked by its marketing representatives, the parties have stipulated that they average more than 40 hours per week. -7- 211, respectively, and from withholding unpaid overtime wages due to the marketing representatives.3 In its answer, John Alden asserted as an affirmative defense, inter alia, that the ___________ marketing representatives were exempt from the applicable regulations of the FLSA as "administrative employees" under section 13 of the Act, 29 U.S.C. 213(a)(1). The parties submitted the case to the district court for decision on cross-motions for summary judgment, based on their stipulation of facts as described above. It was undisputed that the marketing representatives routinely worked more than 40- hour workweeks without overtime pay and that the company did not keep records of the hours worked by each during a workweek. Therefore, the only issue before the district court was whether the marketing representatives could be considered "administrative employees" under the FLSA. In a Memorandum and Order dated October 8, 1996, the court concluded that the marketing representatives satisfied the Department of Labor's ("DOL") regulatory requirements for the administrative exemption, and therefore entered judgment in favor of John Alden. See Reich v. ___ _____ John Alden Life Ins. Co., 940 F. Supp. 418 (D. Mass. 1996). ________________________ In finding these employees to be exempt, the court applied the regulatory "short test" for the administrative exemption, as set forth in 29 C.F.R. 541.2(e)(2). First, the court addressed whether a marketing representative's primary duty  ____________________ 3 Specifically, the Secretary seeks to recover unpaid overtime wages owed to 29 marketing representatives, 16 of whom were still employed at John Alden at the time of the suit. -8- consists of "[t]he performance of office or nonmanual work directly related to management policies or general business operations," as required by 541.2(a)(1). In concluding that this "primary duty" requirement had been met, the court first found that marketing representatives perform the administrative tasks of "promoting sales" and "representing the company" within the meaning of the DOL's interpretative regulations, see 29 ___ C.F.R. 541.205(b). The court thus rejected the Secretary's contention that, because they are concerned with securing sales for the company, marketing representatives perform non- administrative "production" work, the distinction drawn in  541.205(a). See John Alden, 940 F. Supp. at 421-22. Completing ___ __________ its analysis of the "primary duty" requirement, the court went on to find that the work performed by the employees is of "substantial importance to the management or operation of the business" within the meaning of 541.205(a) and (c), noting that "[t]he success of the company in New England depends in large part on the success of the marketing representatives who promote sales of John Alden products." Id. at 422-23. ___ The court then turned to the second part of the short test, which provides that an exempt administrative employee must engage in work that requires the exercise of "discretion and independent judgment." 29 C.F.R. 541.2(e)(2). The court found that this requirement had been met on the facts before it as well, noting that marketing representatives exercise discretion and use their own judgment in deciding which agents to contact -9- and which products to emphasize on a given day. See id. at 423- ___ ___ 24. Thus, having found that both prongs of the short test had been satisfied, the court concluded that the marketing representatives qualified as administrative employees and were thus exempt from the FLSA's overtime requirements. Following the entry of judgment in favor of John Alden, the Secretary filed a timely notice of appeal to this Court. The case is now in order for decision. III. STANDARDS OF REVIEW III. STANDARDS OF REVIEW Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a motion for summary judgment: The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The trial court must view all facts and draw all inferences in the light most favorable to the nonmoving party. See Continental ___ ___________ Cas. Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 373 (1st _________ ___________________________ Cir. 1991). When deciding cross-motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn. See Blackie v. Maine, 75 ___ _______ _____ F.3d 716, 721 (1st Cir. 1996). Summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain. Id. ___ Because the summary judgment standard requires the trial court to make a legal determination rather than to engage -10- in factfinding, appellate review is generally governed by the de __ novo standard. See National Amusements, Inc. v. Town of Dedham, ____ ___ __________________________ ______________ 43 F.3d 731, 735 (1st Cir.), cert. denied, 515 U.S. 1103 (1995). ____________ However, the particular procedural vehicle by which this case was decided by the district court requires some deviation from the norm. As noted earlier, the parties cross-moved for summary judgment on stipulated facts, with their legal arguments focused on the significance to be accorded to the agreed-upon facts. Thus, in effect, the parties submitted this case to the district court as a case stated. Cf. Equal Opportunity Employment Comm'n ___ ___________________________________ v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 603 (1st ____________________________________ Cir.), cert. denied, 116 S. Ct. 65 (1995). As this Court has ____________ stated in a similar case: [W]here, in a nonjury case, "the basic dispute between the parties concerns the factual inferences . . . that one might draw from the more basic facts to which the parties have drawn the court's attention," . . . the district court is freed from the usual constraints that attend the adjudication of summary judgment motions. Federaci n de Empleados Tribunal Gen. de _____________________________________________ Justicia v. Torres, 747 F.2d 35, 36 (1st ________ _______ Cir. 1984) (Breyer, J.). The court may then engage in a certain amount of differential factfinding, including the sifting of inferences. By the same token, the court of appeals may assume that "the parties considered the matter to have been submitted below as a case ready for decision on the merits." Id. Consequently, the standard for ___ appellate oversight shifts from de novo ________ review to clear-error review. Id. at 603. ___ Here, as in Steamship Clerks, in reaching its decision ________________ the lower court was required first to engage in some differential -11- factfinding -- i.e., the drawing of factual inferences from the stipulated facts -- and then to make a legal determination based upon these facts. Thus, this appeal involves both factual and legal determinations. This Court will apply the more deferential clear-error standard when reviewing the factual inferences drawn by the court below, id., while the lower court's ultimate ___ application of the law to the facts, both those stated and inferred, remains subject to de novo review. Id. _______ ___ In parsing out the questions of fact from the ultimate legal conclusion, we are guided by our decision in Reich v. _____ Newspapers of New England, Inc., 44 F.3d 1060 (1st Cir. 1995), ________________________________ where the Court considered whether certain newspaper employees fell within the professional exemption to the FLSA's overtime pay provisions, 29 U.S.C. 213(a)(1). Adopting the approach used by the Fifth Circuit in Dalheim v. KDFW-TV, 918 F.2d 1220, 1226 (5th _______ _______ Cir. 1990), this Court recognized that "there are three distinct types of findings involved in determining whether an employee is exempt." Newspapers of New England, 44 F.3d at 1073. First, the _________________________ court must make findings concerning the so-called "historical facts" of the case, such as determining an employee's day-to-day duties. Id. Second, the court must draw factual inferences from __ these historical facts, for instance, to conclude whether these day-to-day duties require "invention, imagination, or talent" as required by applicable regulations. Id. Finally, the trial __ court must reach the ultimate conclusion of whether an employee is exempt, based on both historical facts and factual inferences. -12- Id. Having separated out the lower court's determinations in __ this manner, we concluded that the first two types of findings, as essentially factual determinations, were subject to the clearly erroneous standard of review. Id. As for the district __ court's ultimate finding, we noted that "[a]lthough this is based on both historical facts and factual inferences, it is a conclusion of law, over which we exercise plenary review." Id. __ The Court will apply this framework in its review of the decision at issue here. Of course, there are no "first tier" findings to review, as the historical facts were agreed upon in the parties' stipulation. Accordingly, the factual inferences drawn by the district court from the stipulated facts will be reviewed for clear error, while the lower court's ultimate legal determination engenders plenary review. Finally, while recognizing that the determination of whether an employee is exempt is clearly tied to the district court's inferential factfinding,4 we remain acutely aware of our duty to engage in a thorough review of the record. See id. at ___ ___ 1073. Moreover, we must review the decision below to ensure that the court's factfinding was guided by the proper legal standards, as "to the extent that findings of fact can be shown to have been predicated upon, or induced by, errors of law, they will be  ____________________ 4 As the Fifth Circuit has noted, "[i]n the great majority of cases, the district court's findings of fact and the inferences it draws, if carefully set forth and supported by the record, will all but compel the legal conclusion that a given employee is or is not exempt. Absent some fundamental legal error, those conclusions will usually stand undisturbed on appeal." Dalheim, _______ 918 F.2d at 1226-27. -13- accorded diminished respect on appeal." Dedham Water Co. v. _________________ Cumberland Farms Dairy, Inc., 972 F.2d 453, 457 (1st Cir. 1992). ____________________________ IV. DISCUSSION IV. DISCUSSION The FLSA establishes, as a general rule, that employees must be compensated at a rate not less than one and one-half times their regular rate for all overtime hours. 29 U.S.C.  207(a)(1). The Act further defines overtime as employment in excess of 40 hours in a single workweek. Id. However, this __ overtime provision does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity . . . (as such terms are defined and delimited from time to time by regulations of the Secretary)." 29 U.S.C. 213(a)(1). Of course, the remedial nature of the statute requires that FLSA exemptions be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960). ______ __________________ Further, it is the employer in an FLSA case that bears the ultimate burden of establishing that its employees fall within the exemption. See Newspapers of New England, 44 F.3d at 1070. ___ _________________________ The specific parameters of the FLSA's administrative exemption are not set forth in the statute, but are instead articulated in the DOL's regulations and interpretations. The regulations, promulgated pursuant to an express delegation of legislative authority, are to be given controlling weight unless found to be arbitrary, capricious, or contrary to the statute. -14- See Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 ___ ___________________ _________________________________ U.S. 837, 843-44 (1984). On the other hand, the interpretive regulations are not conclusive, as they merely set forth the Secretary's official position on how the regulations should be applied in specific contexts. See Newspapers of New England, 44 ___ _________________________ F.3d at 1070. Even so, these interpretations have the "power to persuade, if lacking power to control," as they "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Skidmore v. Swift & ________ _______ Co., 323 U.S. 134, 140 (1944). ___ The requirements of the administrative exemption are set forth in the regulations at 29 C.F.R. 541.2. That regulation outlines both a short and a long test for determining whether an employee qualifies for the administrative exemption; the short test is used for employees whose salaries are more than $250 per week. 29 C.F.R. 541.2(e)(2). Since the parties have stipulated that the marketing representatives earn more than $250 per week, there is no dispute that the short test governs the instant case. Under the short test, John Alden must demonstrate: (1) that the primary duty of the marketing representative consists of "[t]he performance of office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers," 29 C.F.R. 541.2(a)(1),5  ____________________ 5 To be more precise, the first prong of the short test set forth at 541.2(e)(2) requires that the "primary duty consists of the performance of work described in paragraph (a) of this -15- and (2) that such primary duty "includes work requiring the exercise of discretion and independent judgment," 29 C.F.R.  541.2(e)(2). The district court found, and we agree, that the marketing representatives meet both parts of this test. A. Work Directly Related to Management or Operations A. Work Directly Related to Management or Operations As stated above, under this first prong of the test John Alden must show that its marketing representatives have as a primary duty "office or nonmanual work directly related to management policies or general business operations" of John Alden or its customers. 29 C.F.R. 541.2(a)(1). In the parties' stipulation, the "primary duty" of the marketing representatives is described as follows: to contact and deal with licensed independent insurance agents ("agents"), and related activities, to increase purchases of John Alden insurance products by end-purchasers who are in contact with the agents. As there is no dispute that this statement describes "office or nonmanual work," the only question that remains is whether this primary duty is "directly related" to John Alden's management policies or general business operations. The interpretative regulations concerning the administrative exemption are set forth at 29 C.F.R. 541.201 through 541.215. Of particular relevance is section 541.205, which specifically addresses the "directly related to management  ____________________ section." For the sake of simplicity, the Court has quoted directly from paragraph (a) in setting out the short test. -16- policies or general business operations" language under consideration. Subsection 541.205(a) provides as follows: The phrase "directly related to management policies or general business operations of his employer or his employer's customers" describes those types of activities relating to the administrative operations of a business as distinguished from "production" or, in a retail or service establishment, "sales" work. In addition to describing the types of activities, the phrase limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers. Thus, 541.205(a) of the interpretations further subdivides the first prong of the short test into two subparts: (1) the employee must be engaged in "administrative" rather than "production" activity; and (2) this administrative activity must be of "substantial importance" to management or operations. The district court found that both parts of this test had been satisfied, and thus concluded that the work of the marketing representatives was "directly related" to John Alden's business operations. See John Alden, 940 F. Supp. at 421-23. As ___ __________ the Fifth Circuit has noted, "[w]hether an employee's work is or should be deemed 'directly related' to business operations is an inference drawn from the historical facts." Dalheim, 918 F.2d at _______ 1230. Thus, we review this finding for clear error. Id.; see ___ ___ also Newspapers of New England, 44 F.3d at 1073. ____ _________________________ 1. The Administrative-Production Dichotomy 1. The Administrative-Production Dichotomy Subsection 541.205(b) of the interpretations offers the following definition of "administrative" work: -17- The administrative operations of the business include the work performed by so-called white collar employees engaged in "servicing" a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control. However, applying the administrative-production dichotomy is not as simple as drawing the line between white-collar and blue- collar workers. On the contrary, non-manufacturing employees can be considered "production" employees in those instances where their job is to generate (i.e., "produce") the very product or service that the employer's business offers to the public. See, ___ e.g., Reich v. New York, 3 F.3d 581, 587-89 (2d Cir. 1993), cert. ____ _____ ________ _____ denied, 510 U.S. 1163 (1994) (police investigators conduct or ______ "produce" criminal investigations); Dalheim, 918 F.2d at 1230-31 _______ (television station's producers, directors, and assignment editors "produced" newscasts, and were thus non-exempt). Applying this distinction, the district court held that the marketing representatives were engaged in administrative rather than production activities, a finding in which this Court joins. As stated in the stipulation of facts, John Alden is in the business of designing, creating, and selling insurance policies to the public. It follows, as the district court properly recognized, that the "products" generated by John Alden are these insurance policies themselves. As the marketing representatives are in no way involved in the design or generation of insurance policies, the very product "that the -18- enterprise exists to produce and market," Dalheim, 918 F.2d at _______ 1230, they cannot be considered production employees. In its arguments both to the lower court and on appeal, the Secretary has urged that the Third Circuit's decision in Martin v. Cooper Electric Supply Co., 940 F.2d 896 (3d Cir. ________ ____________________________ 1991), cert. denied, 503 U.S. 936 (1992), compels the conclusion ____________ that the employees at issue here are production employees. However, both the district court and John Alden have properly distinguished Cooper Electric from the instant case. The company _______________ at issue in Cooper Electric was a wholesaler that did not ________________ manufacture any products of its own, but instead sold products made by other firms. Id. at 903. Thus, the parties stipulated __ that the wholesaler's primary business purpose was to produce sales of electrical products. Id. Since the employees at issue __ in Cooper Electric, the company's salespeople, worked to generate _______________ the very product that the company existed to market -- sales of electrical products -- the Third Circuit concluded that they were non-exempt production employees. Id. at 903-04. Of course, the __ facts of Cooper Electric are clearly distinguishable from this _______________ case, as John Alden does indeed generate a product, insurance policies, not merely sales of a product. In an attempt to answer this argument, the Secretary points out that the stipulation of facts describes John Alden's business purpose as the design, creation, and sale of insurance ________ policies. Thus, the Secretary contends that, in addition to the production of insurance policies, John Alden also produces sales, -19- and that any employee engaged in the generation of sales should be deemed non-exempt under the logic of Cooper Electric.6 ________________ However, Cooper Electric itself provides an effective counter. ________________ In discussing the "servicing" component of the Secretary's interpretations, see 29 C.F.R. 541.205(b), the Third Circuit ___ explained that "servicing a business" entailed "employment activity ancillary to an employer's principal production _________ activity." Cooper Electric, 940 F.2d at 904 (emphasis in ________________ original). In the instant case, the activities of the marketing representatives are clearly ancillary to John Alden's principal production activity -- the creation of insurance policies -- and therefore could be considered administrative "servicing" within the meaning of section 541.205(b). As the district court noted, the day-to-day activities of marketing representatives are more in the nature of "representing the company" and "promoting sales" of John Alden products, two examples of exempt administrative work provided by 541.205(b) of the interpretations. As John Alden's primary contact with the insurance market (via agent contacts), marketing representatives represent the company by keeping the market informed of changes in John Alden's product offerings and pricing structure. Further, by advising agents as to which of John  ____________________ 6 In the context of a retail or service establishment, section 541.205(a) expressly provides that "sales" work is not administrative. However, as the Secretary recognizes, insurance companies are not retail or service establishments within the meaning of the FLSA, see 29 C.F.R. 779.316, and thus this ___ provision is inapplicable to the present case. -20- Alden's products to market against competing products, and by helping them put together proposals for bidding on new business, marketing representatives are, again to quote Cooper Electric, _______________ engaged in "something more than routine selling efforts focused simply on particular sales transactions." Id. at 905. Rather, ___ their agent contacts are "aimed at promoting (i.e., increasing, developing, facilitating, and/or maintaining) customer sales generally," id. (emphasis in original), activity which is deemed _________ ___ administrative sales promotion work under section 541.205(b). Therefore, there was no error in the district court's finding that John Alden's marketing representatives are engaged primarily in administrative rather than production work. -21- 2. Substantial Importance to Management or Operations 2. Substantial Importance to Management or Operations In addition to drawing the administrative-production work dichotomy, 29 C.F.R. 541.205(a) limits the "directly related" language to "persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers." Of course, employees who formulate management policies or oversee general business operations easily satisfy this "substantial importance" requirement. See 29 C.F.R. 541.205(c). However, the ___ interpretations make it clear that the exemption is not to be limited solely to so-called "management" personnel: As used to describe work of substantial importance to the management or operation of the business, the phrase "directly related to management policies or general business operations" is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole. Employees whose work is "directly related" to management policies or to general business operations include those [whose] work affects policy or whose responsibility it is to execute or carry it out. The phrase also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business. 29 C.F.R. 541.205(c). Examples of employees or positions that generally meet the "substantial importance" requirement include credit managers, claim agents and adjusters, wage-rate analysts, securities brokers, and promotion men. See 29 C.F.R. ___ 541.205(c)(5). However, the particular title given to an -22- employee is not determinative, as an employee's exempt status must instead be predicated on whether his or her duties and responsibilities meet all of the applicable regulatory requirements. See 29 C.F.R. 541.201(b). ___ In applying these interpretations, the district court first recognized that "the work of the marketing representatives is critically important to John Alden's business," in that "[t]he success of the company in New England depends in large part on the success of the marketing representatives who promote sales of John Alden products." John Alden, 940 F. Supp. at 422-23. ___________ Having thus found that the marketing representatives were engaged in work that "affects business operations to a substantial degree" -- one of the categories of work deemed to be of "substantial importance" under 29 C.F.R. 541.205(c) -- the district court concluded that their work met this prong of the test. Id.  __ On appeal, the Secretary contends that, in applying the interpretations, the district court misconstrued the concept of "substantial importance" so as to require plenary review of this issue. In short, the Secretary submits that the lower court improperly equated economic impact with substantial importance, so that if an employee's work contributes to an employer's financial well-being, that fact alone is sufficient to satisfy the substantial importance requirement. If the court did indeed misconstrue the concept of "substantial importance," then its -23- factual inferences were drawn with the wrong legal standard in mind, and it would have erred as a matter of law. We recognize that more than one circuit has held that "[t]he financial effect of employee activity cannot alone show work of 'substantial importance to the management or operation' of an employer's business." Cooper Electric, 940 F.2d at 906; _______________ see also Dalheim, 918 F.2d at 1231.7 As stated by the Fourth _________ _______ Circuit in Clark v. J.M. Benson Co., 789 F.2d 282 (4th Cir. _____ ________________ 1986), in assessing substantial importance it is necessary to look at "the nature of the work, not its ultimate consequence." ______ Id. at 287 (emphasis in original). Further, the interpretive __ regulations clearly dismiss the view that this requirement can be met simply by showing a link between poor performance and lost profits: A messenger boy who is entrusted with carrying large sums of money or securities cannot be said to be doing work of importance to the business even though serious consequences may flow from his neglect. An employee operating very expensive equipment may cause serious loss to his employer by the improper performance of his duties. . . . But such employees, obviously, are not performing work of such substantial importance to the management or operation of the business that it can be said to be "directly related to management policies or general business operations" as that phrase is used in  541.2.  ____________________ 7 In Dalheim, the employer argued for substantial importance by _______ stressing that "if a producer performs poorly, KDFW's bottom line might suffer." Dalheim, 918 F.2d at 1231. The Court held that _______ "[a]s a matter of law, that is insufficient to establish the direct relationship required by 541.2 by virtue of the 'substantial importance' contemplated by 541.205(c)." Id. __ -24- See 29 C.F.R. 541.205(c)(2). ___ Although the district court did not expressly set forth the test in the above manner, our review of the district court's reasoning convinces us that these principles were taken into account in assessing substantial importance. Contrary to the Secretary's assertion, the court did not simply equate "substantial importance" with financial impact. Rather, after noting the economic significance of their sales promotion work, the court then proceeded to consider the nature of the work ______ undertaken by the marketing representatives, which the court recognized required them to: a) understand the nature of the evolving insurance market, b) grasp the subtleties of that market, c) familiarize themselves with their agents, their competitors and the needs of existing and prospective end-purchasers, and d) respond quickly in identifying and promoting a John Alden product when an agent contemplates a particular competitive product. John Alden, 940 F. Supp. at 423. In light of this, we are ___________ satisfied that the district court did not misconstrue the nature of the "substantial importance" inquiry, as it considered the nature of the employee's work as well as the consequences of that work.8 Accordingly, because the district court was operating  ____________________ 8 While recognizing the Fourth Circuit's statement that "[t]he regulations emphasize the nature of the work, not its ultimate ______ consequence," J.M. Benson, 789 F.2d at 287 (emphasis in ____________ original), we would find it difficult to conclude that a certain kind of work was "substantially important" to business operations without also considering the consequences of that work. -25- within the proper legal framework, we will review its inferential factfinding on this issue for clear error. Our review of the record finds ample support for the lower court's conclusion. First and foremost, as John Alden's primary contact with the independent agents, marketing representatives are the insurance market's principle source for information about John Alden and its products. Moreover, in the course of their daily activities, these employees gather information about their agents, the agents' customers, and the insurance market as a whole -- such as information about changes in consumer needs, or regarding the success of certain competitors' offerings. The marketing representatives must then use all of this information both to pique their agents' interest in John Alden, and to suggest products or product combinations that an agent's customers might find attractive. In addition, the marketing representatives can pass along the information they have compiled to their supervisors, who later relay the same to John Alden's management, who can then factor it into decisions on new product designs and offerings. It is certainly reasonable to draw the inference that this type of work, both by its nature and in its consequence, would affect John Alden's business operations to a substantial degree. Indeed, it would appear that work of this nature -- disseminating information to the marketplace, understanding customers and competitors, and gathering available information to be used in putting together proposals and packages that are -26- appropriate for those customers -- is directly related to operations, and at the heart of John Alden's business success. As such, we find no error in the district court's conclusion on this issue. Lastly, the Secretary attaches some significance to the fact that John Alden employs a number of marketing representatives in this region, stressing that the collective economic impact of a group of employees is insufficient to satisfy the substantial importance requirement. See Cooper ___ ______ Electric, 940 F.2d at 906. However, the Secretary's own ________ interpretative regulations provide a sufficient rejoinder: The fact that there are a number of other employees of the same employer carrying out assignments of the same relative importance or performing identical work does not affect the determination of whether they meet this test so long as the work of each such employee is of substantial importance to the management or operation of the business. 29 C.F.R. 541.205(c)(6). In the instant case, we find that the work of each marketing representative, standing alone, has a substantial effect on John Alden's business.9 As set out in the parties' stipulation, the sixteen marketing representatives currently employed in the regional office are responsible for the promotion of the company's products throughout all of New England (minus Connecticut). Moreover, each marketing representative is individually responsible for a deck of 500-600 agents, with each  ____________________ 9 It is unclear from the district court's discussion whether it considered the consequences of the marketing representatives' work individually or as a whole. Thus, we consider this issue based upon our own review of the record. -27- deck generating, on average, from $1.5 million to $3 million in sales annually. In light of all this, we have little difficulty in finding that each individual marketing representative carries out a "major assignment[] in conducting the operations of the business," and "affects business operations to a substantial degree" through his or her own sales promotion activities. See ___ 29 C.F.R. 541.205(c). The district court was not clearly wrong in finding that the marketing representatives are engaged in administrative work of substantial importance to John Alden's business operations. Accordingly, we agree that these employees are engaged in administrative work "directly related to management policies or general business operations," as required under the first prong of the short test, 29 C.F.R. 541.2(a)(1). We now turn to the court's analysis of the "discretion and independent judgment" part of the test. B. Work Requiring Discretion and Independent Judgment B. Work Requiring Discretion and Independent Judgment To satisfy the second prong of the short test, John Alden must demonstrate that its marketing representatives are engaged in work that requires the exercise of discretion and independent judgment. 29 C.F.R. 541.2(e)(2). The Secretary's interpretations elaborate on this requirement as follows: In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term . . . , moreover, implies that the person has the authority or power to make an independent choice, free -28- from immediate direction or supervision and with respect to matters of significance. 29 C.F.R. 541.207(a). The interpretations further advise that "the discretion and independent judgment exercised must be real and substantial, that is, they must be exercised with respect to matters of consequence." 29 C.F.R. 541.207(d)(1). However, the exempt employee need not have final decisionmaking authority over such matters; "[e]ven though an employee's work is subject to approval, even to the extent that a decision may be reversed by higher level management, it does not follow that the work did not require the exercise of discretion and independent judgment." Dymond v. United States Postal Serv., 670 F.2d 93, 96 (8th Cir. ______ ___________________________ 1982); see also 29 C.F.R. 541.207(e). ________ The district court found, and we agree, that the marketing representatives exercise discretion and independent judgment in carrying out their duties. It is undisputed that these employees have discretion in choosing which agents to contact on any given day, and concerning which products to discuss with each agent. In addition, the marketing representatives rely on their own knowledge of an agent's business to help tailor proposals for the agent's end-customers. Further, they must be able to anticipate the competing products that the agent's customers might be considering, and distinguish John Alden's offerings from those of competitors. Thus, there is clear support in the record for the district court's conclusion that John Alden's marketing representatives exercise discretion -29- and independent judgment in the course of their day-to-day agent contacts. While recognizing that the marketing representatives do exercise some discretion in their dealings with agents, the Secretary argues that this discretion is not exercised with respect to "matters of consequence" within the meaning of the interpretive regulations. However, the matters on which these employees exercise their discretion and judgment -- which agent would be in the best position to sell a given product, and which products would be most attractive to a given customer -- would certainly appear to be "of consequence" to John Alden's business. Indeed, this work would seem to be of equal or greater importance than some of the work the Secretary's interpretations identify as exempt, such as the duties of an administrative assistant to an executive,10 or those of a customer's man in a brokerage house.11 See 29 C.F.R. 541.207(d)(2). Thus, we will not upset the ___ district court's decision on this ground.12  ____________________ 10 "The regulations . . . contemplate the kind of discretion and independent judgment exercised by an administrative assistant to an executive, who without specific instruction or prescribed procedures, arranges interviews and meetings, and handles callers and meetings himself where the executive's personal attention is not required." 29 C.F.R. 541.207(d)(2). 11 The test includes "the kind of discretion and independent judgment exercised by a customer's man in a brokerage house in deciding what recommendations to make to a customer for the purchase of securities." Id. ___ 12 As the district court noted, the work of the marketing representatives does not at all resemble the given examples of nonexempt work where discretion is exercised on matters of relatively little consequence: i.e., a truck driver's decision on which route to follow; a shipping clerk's decision on the method -30- The Secretary also contends that the lower court committed error by mistaking the mere "use of skill in applying techniques, procedures, or specific standards," 29 C.F.R. 541.207(b), for the required discretion and independent judgment. The Secretary submits that the marketing representatives, in informing agents and persuading them to recommend John Alden products, are simply applying the sales techniques they learned in training sessions and weekly sales meetings. The Secretary also points out that the marketing representatives receive both formal and informal guidance about which products and product features to emphasize, and about the general points to make with agents. Thus, the Secretary avers that rather than exercising discretion and independent judgment, these employees are simply making decisions within a given set of parameters, the type of work that would not qualify for the exemption. See 29 C.F.R. 541.207(c).13 ___ However, as the district court found, the record simply does not support the Secretary's assertion. These employees do not use prepared scripts or read from a required verbatim  ____________________ of packing and mode of shipment; and a bookkeeper's decision on whether to post to one ledger or another first. See 29 C.F.R. ___ 541.207(d)(1). 13 The interpretive regulations offer the following examples of work in which skill in applying standards or techniques can be mistaken for discretion: inspectors who develop facts to assess whether prescribed standards have been met; lumber "graders" who inspect each "stick" and then place each into a well-defined grading category; personnel clerks who screen applications and reject those that do not meet prescribed minimum requirements. See 29 C.F.R. 541.207(c)(1)-(6). ___ -31- statement, nor do they operate within the contours of a prescribed technique or "sales pitch". On the contrary, the content of a given conversation with an agent is dictated by the needs or customer base of that agent, or by the particular information sought by the marketing representative during that phone call. Further, to the extent that the marketing representatives receive guidance about products to emphasize and suggested points to make with agents, they nonetheless exercise discretion in applying this instruction -- for instance, in determining which agent may have an interest in that product, or in fashioning bid proposals that meet the needs of the agent's customers.14 See Atlanta Prof'l Firefighters Union, Local 134 v. ___ ____________________________________________ City of Atlanta, 920 F.2d 800, 805 (11th Cir. 1991) (employees ________________ who retained "discretion in implementing [the] directions" of another meet discretion and independent judgment test). In light of all this, we concur that the marketing representatives "are not merely 'skilled' workers who operate within a strict set of rules. Rather, they exercise significant discretion in their daily contacts with various insurance agents." John Alden, 940 __________ F. Supp. at 423. The district court did not commit error in finding that the primary duty of the marketing representatives "includes work  ____________________ 14 By way of comparison, the Court notes that a "customer's man in a brokerage house" likely receives similar training about product features and points of emphasis. Under the interpretive regulations, 29 C.F.R. 541.207(d)(2), this employee exercises the requisite discretion when he or she applies this guidance to make a recommendation to a customer for a securities purchase. -32- requiring the exercise of discretion and independent judgment" within the meaning of 29 C.F.R. 541.2(e)(2). Therefore, we conclude that the second prong of the administrative exemption has been met in this case. V. CONCLUSION V. CONCLUSION For all of these reasons, we agree with the district court's determination that John Alden's marketing representatives are exempt administrative employees. Accordingly, the judgment below is affirmed. affirmed ________ -33-