# United States Court of Appeals
## For the First Circuit

No. 07-1768

THOMAS W. CASH,

Plaintiff, Appellant,

v.

CYCLE CRAFT COMPANY, INC.,
dba Harley-Davidson/Buell of Boston,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Lipez and Howard, Circuit Judges,

and Oberdorfer,[*] Senior District Judge.

Nina Joan Kimball with whom Justine H. Brousseau was on brief for appellant.
Seth H. Salinger was on brief for appellee.

November 20, 2007

---

[*]Of the District of Columbia, sitting by designation.

**OBERDORFER, <u>Senior District Judge</u>**.  Plaintiff-Appellant Thomas W. Cash appeals the district court's grant of summary judgment to his former employer, Defendant-Appellee Cycle Craft Company, Inc., d/b/a Harley-Davidson/Buell of Boston ("Boston Harley").  Cash contends Boston Harley failed to pay him overtime at the proper rate in violation of both the Fair Labor Standards Act, 29 U.S.C. §§ 210-19 (2004), and the Massachusetts Minimum Fair Wages Act, Mass. Gen. Laws ch. 151, §§ 1A, 1B (2004).  The district court granted Boston Harley's motion for summary judgment, concluding that Cash was an exempt "administrative" employee within the meaning of these Acts.  <u>Cash</u> v. <u>Cycle Craft Co.</u>, 482 F. Supp. 2d 133 (D. Mass. 2007).  We **AFFIRM**.

## I.  BACKGROUND

We review the facts in the light most favorable to Cash, the nonmoving party below.

In fall 2003, Cash was shopping at the Boston Harley motorcycle store and met the General Manager, Ron Buchbaum.  This encounter, along with another in January 2004, led to discussions of Cash potentially working at Boston Harley.  Buchbaum wanted Cash to create a new customer-service position.  Cash drafted a job description for the position and Buchbaum suggested some changes, which Cash adopted.  The job description titled the position "New Purchase/Customer Relations Manager" and identified the following responsibilities:

-2-

The ability to develop and implement a[n] overall Customer Service strategic plan that will allow [Boston Harley] to reach its current and long-term customer satisfaction goals.

The ability to develop a clear business plan to support organizational changes, where needed, that provide efficiency and improve customer service delivery.

To ensure service goals and expectations of customers are met with optimum quality and satisfaction.

Identify and expeditiously resolve delivery problems. Develop and implement appropriate action.

Liason between National representatives, the Dealership and the customer, resolving issues to assure complete and on-time shipment of bike and accessories delivery.

The job description also stated the position's qualifications, including a "[m]inimum of five years experience" in both "Customer Service Management" and "as a Supervisor." Buchbaum offered Cash the position, which provided a $60,000 annual salary, along with health insurance and vacation after one year.

Cash accepted the offer and started working at Boston Harley on April 26, 2004. His duties included working with various Boston Harley departments to make sure that they outfitted and delivered each motorcycle according to the particular purchase order. If ordered parts were not installed, he was to contact the service manager, Michael Sienkiewicz, and tell him what needed to be done. Once problems were resolved, Cash was to tell the finance

department that the motorcycle was ready. That department would then set up a time with the customer for delivery or pickup. Cash then tracked the purchased motorcycles; it was his job to stay in touch with the customers and make sure that they were satisfied so that they would provide positive customer-feedback reports.

As Cash's job worked out, he did not coordinate motorcycle ordering, delivery, or part installation. Nor did he supervise or manage any employees. However, he attended management meetings, except when Buchbaum instructed him not to. At these meetings, Cash reported the status of previously ordered motorcycles and their scheduled time for pickup or delivery. Often, after Cash provided these reports, Buchbaum told him to leave the meeting.

Cash earned $1,153.85 per week (the prorated amount for his $60,000 salary) during his employment. He received this same salary each week regardless of hours worked, except for two pay periods: (1) the pay period ending August 28, 2004, when he was paid $769.24; and (2) the next pay period, ending September 4, 2004, when he was paid $961.55. Cash states that "he was never paid for hours he worked over 40 hours [per week], yet he was routinely required to work overtime as part of his job, as is reflected in his payroll records."

-4-

On April 8, 2005, almost one year after he started working at Boston Harley, Cash experienced an emotional problem at work.  Boston Harley terminated his employment that day.

On November 4, 2005, Cash brought suit in district court, alleging the statutory violations mentioned above.  On April 6, 2007, the district court granted Boston Harley's motion for summary judgment.  Cash appealed.

## II.  DISCUSSION

### A.  Standard of Review

We review de novo a district court's entry of summary judgment.  Dávila v. Corporación De P.R. Para La Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007).  Like the district court, we take the facts of record in the light most favorable to the nonmovant (here, Cash) and draw all reasonable inferences in his favor.  Id. Summary judgment is appropriate only when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

### B.  Cash's Claims

#### 1.  Fair Labor Standards Act

The Fair Labor Standards Act establishes the general rule that employers must compensate each employee at "a rate not less than one and one-half times the regular rate" for all overtime hours that an employee works.  29 U.S.C. § 207(a)(1).  The Act

defines overtime as employment in excess of 40 hours in a single workweek. Id.

The Act exempts from this general rule certain so-called "white-collar" employees, i.e., "any employee employed in a bona fide executive, *administrative*, or professional capacity . . . ." Id. § 213(a)(1) (emphasis added). Boston Harley contends that Cash was such a "white-collar" employee because he served in an "administrative" capacity.

An employer defending a suit under the Act bears the burden of establishing that a particular employee's job falls within such an exemption. Reich v. John Alden Life Ins. Co., 126 F.3d 1, 7 (1st Cir. 1997). Additionally, "the remedial nature of the statute requires that [its] exemptions be 'narrowly construed against the employers seeking to assert them'" and "'limited to those establishments plainly and unmistakably within [the exemptions'] terms and spirit.'" Id. (quoting Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960)).

The Secretary of Labor has issued regulations that articulate some specific parameters of the exemption. John Alden, 126 F.3d at 7; see 29 C.F.R. § 541.200 (2004). Although the regulations merely state the Secretary's official position on how the statutes should be interpreted, a court must give them "controlling weight unless [the court finds them] to be arbitrary, capricious, or contrary to the statute." John Alden, 126 F.3d at

8 (citing <u>Chevron U.S.A., Inc.</u> v. <u>Natural Res. Def. Council</u>, 467 U.S. 837, 843-44 (1984)).

According to the regulations, to establish that Cash was an "employee in a bona fide administrative capacity," Boston Harley must show that he was an employee

> (1)    [c]ompensated on a *salary or fee basis* at a rate of not less than $455 per week . . ., exclusive of board, lodging or other facilities;
>
> (2)    [w]hose primary duty is the performance of office or non-manual work *directly related to the management or general business operations* of the employer or the employer's customers; and
>
> (3)    [w]hose primary duty includes the *exercise of discretion and independent judgment* with respect to matters of significance.

29 C.F.R. § 541.200 (emphasis added).[1]

### (a)  Salary

Cash meets the $455-per-week compensation threshold in the regulation: he received $1,153.83 per week, except for the two weeks he received $769.24 and $961.55.  He argues, however, that Boston Harley did not pay him on a "salary basis," because it

---

[1]The Secretary issued these regulations during the course of Cash's tenure with Boston Harley; because the changes are largely stylistic, we do not refer to the old regulations.

reduced his pay for these two pay periods.  The regulations state that "[a]n employee will be considered to be paid on a 'salary basis'. . . if the employee regularly receives each pay period on a weekly, or less frequent[,] basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed."  Id. § 541.602(a).  Subject to certain exceptions, "an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked."  Id.  The district court, mistakenly stating that Cash began work on Thursday, August 26, 2004 (instead of April 26, 2004), concluded that these two pay periods accurately reflected the 1.5 weeks Cash worked at this time.

Regardless of this date error, Boston Harley prevails on this point.  A regulation issued August 23, 2004, provides that an employer "shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis." Id. § 541.603(a).  "An *actual practice* of making improper deductions demonstrates" this intent.  Id. (emphasis added).  An actual practice of making improper deductions is evidenced by "the number of improper deductions."  Id.

We conclude that two aberrant paychecks out of the approximately 50 that Cash received do not amount to an "actual

-8-

practice." See Kennedy v. Commonwealth Edison Co., 410 F.3d 365, 372 (7th Cir. 2005) ("Identifying a few random, isolated, and negligible deductions is not enough to show an actual practice or policy of treating as hourly the theoretically salaried."). Indeed, even Cash stated that he was earning a "salary" of $1,153.85 per week.

Accordingly, we conclude that Boston Harley paid Cash on a "salary basis."

### (b) Primary duty related to management and includes exercise of discretion

The next questions are whether Cash's "primary duty" at Boston Harley (a) "was the performance of office or non-manual work directly related to management or general business operations of [Boston Harley] or its customers," and (b) "include[d] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200.

"The term 'primary duty' means the principal, main, major or most important duty that the employee performs." Id. § 541.700. "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." Id.

"The phrase 'directly related to the management or general business operations'" in the exemption's second requirement "refers to the type of work performed by the employee." Id. § 541.201(a). "To meet this requirement, an employee must perform

work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." Id. "Work directly related to management or general business operations includes work in functional areas such as finance, quality control, and personnel management." Id. § 541.201(b).

In general, "the exercise of discretion and independent judgment," i.e., the exemption's third requirement, "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." Id. § 541.202(a). "The term 'matters of significance,'" to which that discretion must apply, "refers to the level of importance or consequence of the work performed." Id.

Regulation 29 C.F.R. § 541.203 provides examples of employees who "generally meet the duties requirements for the administrative exemption." For instance, employees in the financial-services industry are generally exempt "if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial

-10-

products." Id. § 541.203(b). On the other hand, a financial-services employee "whose primary duty is selling financial products does not qualify for the administrative exemption." Id. "Similarly, human-resources managers who formulate, interpret, or implement employment policies generally meet the duties requirements for the exemption, but personnel clerks who merely 'screen' applicants to obtain data regarding their minimum qualifications generally do not meet the duties requirements." Id. § 541.203(e).

The caselaw is consistent with these examples. In John Alden we affirmed a district court's grant of summary judgment in favor of a life-insurance company, concluding that the company's marketing representatives—who worked with outside agents to sell insurance policies to customers—fell under the administrative exemption. 126 F.3d at 3. The first ("salary basis") requirement was not at issue. The Court explained that the marketing representatives' duties met the second ("management") requirement because they were "engaged in something more than routine selling efforts focused simply on particular sales transactions." Id. at 10 (internal quotation marks omitted). "Rather, their agent contacts [were] aimed at promoting (i.e., increasing, developing, facilitating, and/or maintaining) customer sales *generally.*" Id. (internal quotation marks omitted). Their duties also met the third ("discretion") requirement: they had "discretion in choosing

which agents to contact on any given day, and concerning which products to discuss with each agent." Id. at 13. "In addition, the marketing representatives rel[ied] on their own knowledge of an agent's business to help tailor proposals for the agent's end-customers." Id. "[T]he content of a given conversation with an agent [was] dictated by the needs or customer base of that agent, or by the particular information sought by the marketing representative during that phone call." Id. at 14. The Court therefore concluded that the marketing representatives were "not merely 'skilled' workers who operate[d] within a strict set of rules," rather, they exercised significant discretion. Id. Consequently, the Court affirmed the grant of summary judgment to the company. Id.; cf. Dalheim v. KDFW-TV, 918 F.2d 1220, 1231 (5th Cir. 1990) (holding that television station producers' jobs did not fit into administrative exemption because they produced the station's news-department product and were not involved in the administrative operations).

In the run-up to his employment, Cash provided Boston Harley with his conception of the job that he would assume as the "New Purchases/Customer Relations Manager." He described these duties as including the following: (i) developing an "overall Customer Service strategic plan"; (ii) developing a "clear business plan to support organizational changes"; and (iii) taking "appropriate action" regarding delivery problems.

On the job, he performed some, but not all, of the functions that his proposed job description anticipated. He worked with various Boston Harley departments to ensure that motorcycles were properly outfitted and delivered. If ordered parts were not installed on the motorcycles, Cash instructed the Service Manger concerning what needed to be done. He also was to stay in contact with the customers to make sure that they were happy with the service they were receiving. It is reasonable to infer that his performance of these duties was infused by his broader pre-job conception of his responsibilities.

Cash's employment at Boston Harley meets the "management" and "discretion" requirements of the administrative exemption. First, like the marketing representatives in John Alden, Cash was "engaged in something more than routine selling efforts focused simply on particular sales transactions." 126 F.3d at 10. Rather, he focused on improving customer service generally, by coordinating with various Boston Harley departments to ensure that customers were satisfied with their purchase and that they would provide Boston Harley with positive feedback reports. Cf. 29 C.F.R. § 541.203(b) (noting that a financial-services representative who "determin[es] which financial products best meet the customer's needs and financial circumstances" is generally exempt, whereas a financial-services representative who merely "sell[s] financial products" is not). Second, just as the marketing representatives

-13-

in <u>John Alden</u> exercised significant discretion by, among other things, "fashioning bid proposals that me[t] the needs of the agent's customers," 126 F.3d at 14, Cash exercised discretion in reacting to the unique needs of Boston Harley's customers. Thus, Cash was "not merely [a] 'skilled' worker[] who operate[d] within a strict set of rules." <u>Id.</u> Moreover, in return for performing his duties, he earned a $60,000 salary, which was greater or equal to that of all the other managers, except for Buchbaum. Cash's attendance at management meetings, albeit in a limited fashion, further supports his status as a manager. In sum, Cash did not simply produce a product; he exercised independent judgment as he engaged in the company's business operations.

*     *     *

Cash meets each of administrative-exemption requirements under the Fair Labor Standards Act; Boston Harley therefore is not liable to pay him overtime wages.

### 2.     Massachusetts Minimum Fair Wages Act

The Massachusetts statute governing overtime pay mirrors the Fair Labor Standards Act. It states, in relevant part, that "[e]xcept as otherwise provided in this section, no employer in the commonwealth shall employ any of his employees in an occupation . . . for a work week longer than forty hours, unless such employee receives compensation for his employment . . . in excess of forty hours at a rate not less than one and one half

times the regular rate at which he is employed." Mass. Gen. Laws ch. 151, § 1A. The statute also provides for an exception where an employee is employed "as a bona fide executive, or administrative or professional person . . . earning more than eighty dollars per week." Id. § 1A(3).

The "basic overtime provision of the Massachusetts statute is essentially identical to the [Fair Labor Standards Act]." Valerio v. Putnam Assocs. Inc., 173 F.3d 35, 40 (1st Cir. 1999); accord McLaughlin v. Liberty Mut. Ins. Co., 224 F.R.D. 295, 296 (D. Mass. 2004) (referring to the filing of both claims as "[r]iding that same horse"). The Supreme Judicial Court of Massachusetts agrees with this view. See Swift v. Autozone, Inc., 806 N.E.2d 95, 98 (2004) ("[T]he overtime provisions under State law were intended to be 'essentially identical' to Federal law . . . .") (citing Valerio, 173 F.3d at 40); see also Goodrow v. Lane Bryant, Inc., 732 N.E.2d 289, 294 (2000) (stating that the Fair Labor Standards Act and the Massachusetts statute are "nearly identical").

The resolution of Cash's Fair Labor Standards Act claim determines his Massachusetts statutory claim.

### III. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of Boston Harley is **AFFIRMED.**