# United States Court of Appeals
## For the First Circuit

No. 10-2298

CHRISTINE HINES; MARY A. O'CONNOR;
JESSICA LEPORACCI,

Plaintiffs, Appellants,

v.

STATE ROOM, INC.; LONGWOOD EVENTS, INC.;
BELLE MER, INC.; JAMES APTEKER,

Defendants, Appellees,

VERONIQUE CORPORATION,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Patti B. Saris, U.S. District Judge]

Before
Howard, Ripple,* and Selya, Circuit Judges.

John F. Tocci, with whom Cary Gianoulis and Tocci, Goss & Lee, P.C. were on brief, for appellants.
Colleen C. Cook, with whom Jack I. Siegal and Nystrom Beckman & Paris LLP were on brief, for appellees.

November 28, 2011

* Of the Seventh Circuit, sitting by designation.

**RIPPLE**, **Circuit Judge**.     Christine Hines originally brought this action in Massachusetts state court against the State Room, Inc., where she formerly was employed.[1]   In the amended complaint, which was before the district court following removal, Ms. Hines and her coplaintiffs sought unpaid overtime wages that they claimed were due under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, and related state statutes.  In addition to the State Room, Longwood Events, Inc., Belle Mer, Inc. and James Apteker were named as defendants.   After various further amendments, including the addition of counterclaims, and following discovery, the defendants sought summary judgment on the wage claims.  The defendants asserted that the plaintiffs were exempt from the overtime requirement because they were administrative employees under the FLSA, 29 U.S.C. § 213(a)(1).  The plaintiffs countered that their work did not involve sufficient discretion to satisfy the exemption.  The district court determined that the duties of the employees did involve substantial discretion and, under our precedent, the exemption was applicable; accordingly, partial summary judgment was entered for the defendants.  The plaintiffs now appeal.  They continue to contend that their employers have failed to demonstrate that they acted with any

---

[1]   Ms. Hines's original complaint also listed Veronique Corporation as a defendant and claimed that it was the State Room's corporate parent.  Veronique Corporation was dropped as a defendant in the amended complaint and terminated from the action in 2009.

-2-

meaningful discretion and, therefore, to carry the burden of demonstrating the applicability of the exemption. Because the district court correctly applied governing legal principles, we affirm the judgment of the district court.

**I**

**BACKGROUND**

**A. Facts**

The State Room and Belle Mer are affiliated banquet facilities that "host high-end wedding receptions and other social functions" in Boston, Massachusetts, and Newport, Rhode Island, respectively. R.78 at 2. Individual defendant James Apteker is the founder and president of the State Room and Belle Mer. Longwood Events is an affiliated management company that provides accounting and record-keeping services for the banquet facilities. According to the complaint, Longwood is the corporate parent for the State Room and Belle Mer, and the companies share common management.

The plaintiffs are former sales managers[2] at one or both

---

[2] According to their deposition testimony and their resumes, the plaintiffs held different titles at various points in their tenures with the defendant facilities. See, e.g., R.68-4 at 14-15 (Leporacci Dep. 61-62) (stating that she was given "a few different titles . . ., but continued to perform the same duties no matter what the title was" for the majority of her time working for the defendants). However, the plaintiffs themselves use the more generic term "sales manager" in structuring their arguments in this case. The plaintiffs' titles do not affect our analysis, and, therefore, for ease of reading, we employ the plaintiffs' terminology. See Reich v. John Alden Life Ins. Co., 126 F.3d 1, 10

of the defendant facilities: Ms. Hines was employed from 2006 to 2008 at the State Room; Mary O'Connor, at Belle Mer from 2007 to 2008; and Jessica Leporacci, at Belle Mer for several months in 2006, then at the State Room through 2008. As sales managers, the plaintiffs were the primary client contacts on behalf of the event venues. Principally, their role was to secure event business for the company, either by use of a cold-call list kept by management or in response to inquiries by potential clients. When given a cold-call list, the plaintiffs would assess which calls were likely to generate business and would not make calls they determined would be unproductive. See R.68-3 at 7 (O'Connor Dep. 34-35) (explaining that, after researching a list of law firms to cold call, she would not contact a firm of three attorneys to offer to host a holiday party and agreeing that the research she did would help her determine "whether to call or not"). As part of their regular tasks, plaintiffs spoke by phone and in person with potential clients; they toured the facility with potential clients to sell events; and they assisted clients in determining which venue and time might be appropriate for an event and what minimum charges would apply. The goal behind this work was to commit a prospective client to a contract for an event. In addition to the efforts with individual clients and prospective clients, the plaintiffs engaged

---

(1st Cir. 1997) ("[T]he particular title given to an employee is not determinative[ of] an employee's exempt status . . . .").

in broader sales efforts. For example, Ms. O'Connor testified that she marketed Belle Mer by attending Chamber of Commerce or Convention and Visitors Bureau events as the company's representative, again with the goal of "bring[ing] events to Belle Mer." Id. (O'Connor Dep. 36). To bring in business from within her assigned nonprofit sector, Ms. Hines suggested to her supervisor that she could develop a lunch presentation on "'how to plan a gala fundraiser for [a] non[]profit'" as a marketing tool. R.68-20 at 2 (email from Hines to a supervisor).

For the majority of the plaintiffs' tenure with the defendant facilities, their duties extended beyond securing the basic sale and event contracts. They were required to work with clients to design details and menus that would meet each client's expectations;[3] they prepared internal order forms that explained every detail of the event for the operations staff; and from time to time, they attended events to ensure that the client's wishes were carried out. As Ms. O'Connor stated in her deposition, "Soup to nuts is what I was doing back then. You didn't have any events managers. You ran the whole thing." R.68-3 at 14 (O'Connor Dep. 69); id. at 12 (O'Connor Dep. 59) (confirming that her duties included "[c]oordinat[ing] the setup, design, [and] execution of the wedding"); see also R.68-4 at 15 (Leporacci Dep. 63)

---

[3] See, e.g., R.68-4 at 13 (Leporacci Dep. 55) (explaining that she would make suggestions for an event and "could create a custom menu with the chef").

-5-

(describing her work as an events manager as including organizing "tastings, menu selection, . . . linen selection, design of the space, [and] everything else that goes into planning an event"); R.68-2 at 8 (Hines Dep. 44-45) (answering affirmatively when asked if she "work[ed] closely with nonprofit board committees in researching, designing and executing events"). The plaintiffs were responsible for maintaining a relationship with clients and satisfying client needs in the course of their event planning with the defendant venues. See R.68-15 (contemporaneous email from supervisor to sales and events management staff stating, "[I]t is your responsibility to proactively manage client expectations and obligations. You are accountable for the 'life' of this client while they book, and then plan and execute their event with us."); R.68-2 at 18 (Hines Dep. 123) (agreeing that her job was to "keep the client happy" from the initial contact through the actual event).

Indeed, the picture that emerges from the record is one in which the primary role of sales managers was to secure a steady stream of business by selling each prospective client on a package of options--location, timing, atmosphere, design, food and the like, all within the client's budget--and by ensuring that each event so planned was a success. See R.68-3 at 10 (O'Connor Dep. 51-52) (explaining the process of creating an event within a client's budget); id. (O'Connor Dep. 50-51) ("[T]his is a one-time

event, let's make it the most incredible thing you will ever have in your life. Even if you have a small budget, let's still make it the most breathtaking thing that could ever happen to you, and how that is going to happen is customer service. You have got to believe in me."). In so doing, the sales managers secured clients one at a time, but also worked to maintain and enhance the reputation of their venues as a desirable location for custom, high-end events for private and nonprofit clients. See R. 68-2 at 21 (Hines Dep. 145) (confirming that her tasks included "develop[ing] relationships with" clients and "encourag[ing] repeat business"); see also R.72-8 at 8 (Longwood Events Sales Handbook) (instructing sales staff to "[c]apitalize on re-booking opportunities immediately" while clients "have positive feelings about their event").[4]

The record also establishes some things that the plaintiffs did not do in the course of their daily work. Specifically, the plaintiffs had virtually no authority to make any financial decisions. When working with a potential client to secure an event contract, the sales managers were bound by price schedules controlled by management that dictated minimum charges for particular rooms based on the times and dates of the event.

---

[4] See also R.68-21 at 2-3 (email chain in which Ms. Hines's supervisor congratulates her on a successful event in which a nonprofit raised $200,000 and instructs her to "quote these numbers when wooing the big non[]profits," a suggestion with which Ms. Hines agrees).

R.68-3 at 5 (O'Connor Dep. 28) (noting that the prices and minimums "don't change" and that "[t]here is no wavering unless you want to marry in the winter").  Beyond the event minimum, each option a client might select for a particular event carried a price already fixed by management, the sum of which defined the total cost for the entire event, and sales managers were not permitted to deviate or discount in any way without management's approval.  See, e.g., R.72-8 at 6 (Longwood Events Sales Handbook) ("Do not provide discounts or lower [food and beverage] minimums without Sales Director approval."); id. at 7 ("[A]ny discounts are with a Sales Director's approval only.").  Further, although they signed final event contracts as representatives of the defendant businesses, they were permitted to do so only when management had approved the terms.  R.72-9 at 4 (Gullins Aff.).  Indeed, they were prohibited expressly from creating any financial obligations for the businesses without management approval. R.72-8 at 3-4 (emails from supervisor forbidding the staff from creating "obligation[s]" for the company without prior approval); see also R.72-9 at 4 (Gullins Aff.).  They did not generate the form contracts or intake forms that they used to structure their interactions with clients and to forward client information to management. Id. at 3.  They were not supervisors and had no direct authority over any other staff.  Id. They were not policy-makers for their respective businesses.  See id. at 4.

-8-

The plaintiffs were guided by the Longwood's Events Sales Handbook, which presents "[t]he Longwood Events Way of Selling." R.72-8 at 6. Some of the instructions provided are specific and directive, such as "do not hold dates beyond the 7-day timeframe," id., or "[n]ever match a deal from last year," id. at 7. Equally often, however, the handbook's instructions are generalized, strategic or aspirational. See id. at 6 ("Always take the customer['s] perspective. Anticipate what they would want and listen to what they are asking for. Roll up your sleeves and do whatever it takes to ensure the customer has a great impression of [Longwood Events] and the venue, enlisting operations and kitchen where necessary."); id. at 7 ("Always make a concerted effort to up[]sell . . . ."); id. ("Make sure the menu fits the event. Are we selling something requiring a knife and fork for an event which is intended to have a cocktail feel and light seating?"). In addition to the directions provided by the handbook, the defendant businesses provided a scripted response to one specific question that sales managers sometimes received regarding an affiliated venue, the development of which the defendants had abandoned. The vast majority of the plaintiffs' work as sales managers, however, involved unscripted conversations with clients and potential clients.

Ms. Hines earned $77,000 a year in her role, second in the department only to the director of sales; Ms. O'Connor earned

$48,000; Ms. Leporacci earned between $28,000 and $36,000. Although the plaintiffs claimed to have worked more than forty hours per week on a consistent basis--indeed, the offer letters that they received expressly stated that they would work forty-five to fifty-five hours per week[5]--they did not receive overtime pay during their tenure as sales managers because the defendant businesses designated them as "exempt" employees for purposes of overtime laws. Although they were required to punch-in for some portion of their tenure, they were not required to keep specific hours.

All of the plaintiffs had left the defendants' employ by the time this action was commenced. When Ms. Hines resigned in 2008, she requested a severance, which was denied. Mr. Apteker claims that, when Ms. Hines was informed that severance was unavailable, he heard her mumble something that he understood to be a threat that she would go after the company and "find a way" to get the denied severance. R.76-8 at 4 (Apteker Dep. 125).

## B.  District Court Proceedings

After being granted leave by the Massachusetts Attorney General's Office, Ms. Hines filed a class action complaint in the Massachusetts state courts alleging violations of the Massachusetts and federal overtime laws on behalf of herself and a putative

---

[5]  R.68-2 at 11 (Hines Dep. 84); R.68-4 at 11 (Leporacci Dep. 46).

class.  She alleged that the State Room improperly had classified her as an exempt employee in order to avoid its overtime obligations.  The State Room removed the action to the district court.

In an amended complaint filed in federal court, Ms. Hines removed her class action allegations, added Ms. O'Connor and Ms. Leporacci as plaintiffs and added Belle Mer, Longwood and Mr. Apteker[6] as defendants.  The amended complaint included seven claims under the FLSA and related Massachusetts and Rhode Island wage and hour laws.

In response, the defendants filed a state tort counter-claim for abuse of process.  They claimed that the overtime suit was in retaliation for the denial of Ms. Hines's requested severance.  Ms. Hines, in turn, counter-claimed that the abuse of process allegation was made in retaliation for filing the initial suit, relying on the anti-retaliation provision in the FLSA, 29 U.S.C. § 215(a)(3).

Following discovery, the defendants moved for summary judgment on the original wage claims.  Ms. Hines sought summary judgment on her retaliation claim.  The district court granted the defendants' motion for summary judgment and denied Ms. Hines's motion.  The court set forth the relevant portion of the FLSA and

---

[6]  Mr. Apteker was added pursuant to a state statute that deems corporate principals "employers" responsible for wage and hour violations.  See Mass. Gen. Laws ch. 149, § 148.

-11-

the regulations and noted that the central issue in the case was whether the plaintiffs had exercised sufficient discretion and independent judgment in their work to be classified properly as administrative employees exempt from the overtime requirement. The court acknowledged that the FLSA places the burden on the employer to establish the applicability of the exemption and that the courts have required that the exemption be drawn narrowly against the employer. However, the court found this circuit's decisions in Cash v. Cycle Craft Co., 508 F.3d 680 (1st Cir. 2007), and Reich v. John Alden Life Insurance Co., 126 F.3d 1 (1st Cir. 1997), instructive and determined that they were strong support for the defendants' position in the present case. The court concluded that, like the plaintiffs in Cash and John Alden, the plaintiffs here had a primary task of communicating with clients and assessing client needs. Although a handbook guided these important interactions, it did not script them; instead, the plaintiffs' work required a significant measure of judgment in all of their daily interactions. The plaintiffs were "the primary conduit between defendants and their clients," and their "efforts constituted major assignments . . . affecting a substantial portion of defendants' business." R.78 at 18. Further, although the options that the plaintiffs presented to clients for various services were pre-priced by management, the plaintiffs "determined for themselves how best to fit those options to the needs of each individual client."

-12-

Id. That plaintiffs' supervisors had the authority to review and approve, noted the court, was not dispositive under the regulations. After reviewing the evidence, including the plaintiffs' own descriptions of their work for the defendants on their personal resumes, which the opinion set forth in full, the court concluded that the employers had established that the plaintiffs fell properly within the administrative exception.

The court did acknowledge that, with respect to many of the factors identified in the regulations as relevant to the application of the administrative exemption, the plaintiffs had demonstrated questions of fact. The court, moreover, noted that the plaintiffs had produced evidence that weighed against determining that they were properly classified within the administrative exemption: They did not shape (indeed, they were required to follow) management's policies, and they did not negotiate or obligate financially the defendants. Further, the district court concluded that, in its view, taking the evidence in the light most favorable to the plaintiffs, they did not have meaningful discretion regarding the selection of potential clients to approach. Nevertheless, the court found that the evidence clearly demonstrated that the plaintiffs "exercised discretion and independent judgment in determining how to assemble an event to suit each client's taste." Id. at 19. Accordingly, summary judgment was entered for the defendants on the wage claims.

The district court further ruled that disputed issues of fact remained on the abuse of process claim against Ms. Hines, and therefore denied summary judgment on that counter-claim. The parties then jointly moved for entry of a separate judgment under Rule 54(b), which the district court entered upon concluding that the ruling on the wage claims was final and that there was no persuasive reason for delay.[7] Proceedings on the counterclaims were stayed pending the outcome of this appeal.

## II

## DISCUSSION

### A.  Standard of Review

We review a district court's grant of summary judgment de novo. Hunt v. Golden Rule Ins. Co., 638 F.3d 83, 86 (1st Cir. 2011). Summary judgment is proper where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "In the typical case, we will reverse a grant of summary judgment only if, making all factual inferences in favor of the non-moving party, a

---

[7]  Consistent with the duties prescribed in Spiegel v. Trustees of Tufts College, 843 F.2d 38, 43 (1st Cir. 1988), and its progeny, we independently have examined the propriety of a Rule 54(b) certification in the present case and are satisfied that the district court acted within its sound discretion. Specifically, we agree that the ruling upon which judgment was entered was final. Further, we agree that, given the separate factual bases for the claims at issue here and those still unadjudicated in the district court, the court was entitled to conclude that there was "'no just reason for delay.'" Id. (quoting Fed. R. Civ. P. 54(b)).

-14-

rational factfinder could resolve the legal issue for either side."

D & H Therapy Assocs., LLC v. Boston Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011).[8]

## B.  The FLSA and the Department of Labor's Regulations

The FLSA of 1938, as amended, establishes a federal minimum wage and restricts youth labor.  See 29 U.S.C. §§ 201-219. In addition, the Act  requires overtime pay--payment at the rate of one and one-half of the regular rate--for all hours worked in excess of a forty-hour work week.  Id. § 207(a)(1).  The statute also sets forth various exemptions from the overtime requirement. Relevant to the present case, the overtime requirement in § 207 does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity . . . (as such terms are defined and delimited from time to time by regulations of the Secretary . . .)."  Id. § 213(a)(1).

Pursuant to the statute's express delegation of rulemaking authority, the Secretary has issued detailed regulations, following notice-and-comment procedures, defining each

---

[8] We note the plaintiffs' objections to the district court's factual conclusions at summary judgment and, in particular, to the use of the plaintiffs' resumes in determining their job duties. The plaintiffs would have us disregard the resumes because, in their view, it is common practice to include puffery about one's own importance or achievements within any given position.  We see no reason to set forth a categorical rule regarding the use of resumes in FLSA litigation.  Our obligation on review of summary judgment dictates the manner in which we view all of the evidence of record, including the plaintiffs' resumes.

of the exemptions in § 207.  See generally 29 C.F.R. Part 541; see

also 29 U.S.C. § 213(a)(1) (providing authority); John Alden, 126

F.3d at 7-8 (discussing the regulations).

The regulations in effect at the time of the plaintiffs'

employment provide a single three-prong test[9] for determining

whether an employee qualifies for the administrative exemption:

> (a) The term "employee employed in a bona fide
> administrative capacity" in section 13(a)(1)
> of the Act shall mean any employee:
>
> > (1) Compensated on a salary or fee
> > basis at a rate of not less than
> > $455 per week (or $380 per week, if
> > employed in American Samoa by
> > employers other than the Federal
> > Government), exclusive of board,
> > lodging or other facilities;
> >
> > (2) Whose primary duty is the
> > performance of office or non-manual
> > work directly related to the
> > management or general business
> > operations of the employer or the
> > employer's customers; and

---

[9]  In 2004, the Department of Labor amended the regulations governing administrative employees.  Prior to the amendment, the regulations allowed employers to demonstrate an employee's qualification for the exemption under one of two tests, the "long test" and the "short test."  The long test covered lower-income employees; within a certain salary range, an employer was required to demonstrate that more stringent requirements were satisfied to establish an exemption.  When an employee earned above the range included in the long test, the exemption could be demonstrated using the simpler short test.  The long test no longer exists; the short test was modified in the new regulations and is now called the "standard test."  It applies to all employees that an employer seeks to designate as exempt administrative staff.  See generally Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees; Final Rule, 69 Fed. Reg. 22122 (Apr. 23, 2004).

> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a). The sections that follow provide substantial further direction regarding the implementation of this standard test for the administrative exemption, and we shall address them in significant detail below as we analyze the application of the regulatory mandate to the case before us.

At the outset, we note that we are guided by a general interpretive principle. Because of the remedial nature of the statute, the Supreme Court has emphasized that the exemptions should be "narrowly construed" and "limited to those establishments plainly and unmistakably within their terms and spirit." Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960); see also John Alden, 126 F.3d at 7 (quoting Arnold).

The parties concede, and the record is clear, that the sales managers were compensated on a salary basis at a level in excess of the required $455 per week. The parties also agree that the second prong, see 29 C.F.R. § 541.200(a)(2), which requires that the qualifying employee's "primary duty [must be] the performance of . . . work directly related to the management or general business operations of the employer or the employer's customers," is met. The regulations further provide:

> The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To

-17-

> meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

Id. § 541.201(a).

We agree with the parties that the second prong is met. As our decisions in John Alden, 126 F.3d 1, and Cash, 508 F.3d 680, make clear, the work performed by Ms. Hines, Ms. Leporacci and Ms. O'Connor properly is considered administrative. The principal business of the defendant employers is providing banquets. The sales aspect of the defendants' businesses, although necessary to their success, is clearly ancillary to the principal function of actually providing the banquet services themselves. The plaintiffs' own descriptions of their duties further make clear that they were focused on more than simple individual sales transactions. With respect to each individual transaction, the sales managers' own testimony indicates that they did not simply close contracts. Instead, they worked with each client to create a custom event in all of the particulars. Further, they worked to establish long-term relationships, to keep clients happy and to maintain the overall reputation of their employers. Accordingly, the second prong of the administrative exemption is satisfied.

## C. Discretion Regarding Matters of Significance

The parties' real dispute in this case concerns the third

prong of the administrative exemption, whether the employees' "primary duty include[d] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). The regulation itself provides substantial further guidance on this point:

> (a) To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

> (b) The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority

-19-

to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

(c) The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment. . . .

. . .

(e) The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources. . . . The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work. . . .

Id. § 541.202.

The plaintiffs contend that they perform virtually none of the duties outlined as "[f]actors to consider" in subsection 541.202(b), that they do not have "authority to make an independent choice, free from immediate direction or supervision," id. § 541.202(c), and that their work, properly characterized, involved more skill than discretion, see id. § 541.202(e). In particular, the plaintiffs focus on their lack of any authority to make any decisions of financial consequence to their employers, their lack of supervisory authority and their lack of policy-making authority.

Again, we begin with our own precedents in John Alden and Cash. In John Alden, 126 F.3d 1, we evaluated a claim by marketing representatives who alleged that John Alden Insurance Co. had misclassified them as exempt and denied overtime in violation of the FLSA. The marketing representatives each worked with a list of independent field agents, not employed by John Alden, who worked directly with end customers seeking insurance. Those agents, in turn, would recommend a variety of insurance products to consumers, including those offered by John Alden's competitors. The marketing representatives, who were charged with presenting their employer's insurance products to the field of independent agents, did so primarily through "maintain[ing] constant contact with [the] agents." Id. at 3. In an individual sales call, the representative attempted to engage the agent in an unscripted conversation about John Alden's product offerings in the way they

determined would market most successfully those offerings ahead of those offered by the competition. Although there were weekly sales meetings at which the representatives were presented with suggested points of emphasis, it was left to an individual representative to determine which particular products to present and discuss in any given conversation, drawing on his own knowledge of the agent's customer base as well as John Alden's new offerings. Id. at 13. Beyond the marketing aspect of representatives' daily work, they also continued to follow sales that already had been made. Specifically, once an agent's customer elected to purchase a John Alden product, the representative would "act[] as a conduit" between the purchasing party and John Alden's own underwriting department. Id. at 4. Their role in actually processing a transaction, however, was limited. They "d[id] not set or negotiate prices or terms of insurance, nor d[id] they have any authority to approve or deny an application, as [that was] done solely by the underwriting department." Id. We concluded that, on those facts, the representatives exercised sufficient discretion to warrant the exemption and, therefore, affirmed the grant of summary judgment to the employer.

In Cash, the plaintiff customer service manager was responsible for ensuring that motorcycles were "outfitted and delivered . . . according to the particular purchase order." 508 F.3d at 682. Following delivery, he would "stay in touch with the

customers and make sure that they were satisfied." Id. On these facts, we also concluded that the customer service manager was required to use discretion and independent judgment in performing his primary duties of communicating with customers concerning their orders. Again, we focused on the fact that he was required to "react[] to the unique needs of [the employer's] customers." Id. at 686.

Even when the record in the present case is evaluated in a light most favorable to the plaintiffs, as we must on summary judgment, the work performed by Ms. Hines, Ms. O'Connor and Ms. Leporacci exhibits a similar level of discretion and independent judgment to the discretion that we already have determined to be sufficient for the exemption. Like the plaintiffs in John Alden and Cash, the plaintiffs here had a primary duty of engaging potential clients and assisting them in selecting from various options from the employers' offerings. Indeed, although the options from which a client could select in any given category were finite, the goal of the sales team was to create a truly custom event for each client. In our view, working with a client to create a custom product, personalized to individual tastes and budgets, exhibits at least as much creative freedom as the John Alden plaintiffs had in marketing insurance plans that they had no authority to create, modify or repackage to suit an individual client. In proposing options for an event within a budget, the

sales managers did not operate within "a prescribed technique or 'sales pitch.'" See John Alden, 126 F.3d at 14. Instead, they were guided by the instructions in the Longwood Events Sales Handbook. That handbook contained certain limited iron rules, but largely provided guidelines. The rules were not so numerous nor the guidelines--to upsell where possible, to make sure menus fit the tone of an event and the like--so specific as to cabin the judgment that the plaintiffs were required to exercise in engaging with clients and prospective clients. Such work requires a significant degree of "invention, imagination and talent," id. at 7 (internal quotation marks omitted). See id. at 14 ("[T]o the extent that the marketing representatives receive guidance about products to emphasize and suggested points to make with agents, they nonetheless exercise discretion in applying this instruction-- for instance, in determining which agent may have an interest in [a particular] product, or in fashioning bid proposals that meet the needs of the agent's customers."); Renfro v. Indiana Michigan Power Co., 497 F.3d 573, 577 (6th Cir. 2007) (noting, in the course of finding adequate discretion among nuclear power plant employees, that the technical manual they used "provide[d] a guideline on how to develop a procedure, not an encyclopedia of strict requirements"); Kennedy v. Commonwealth Edison Co., 410 F.3d 365, 374 (7th Cir. 2005) (noting that the plaintiffs' discretion may be channeled by applicable regulations without defeating the existence

of sufficient discretion).

The plaintiffs repeatedly have emphasized all of the matters about which they had no authority and exercised no discretion, primarily those involving their employers' finances and contractual obligations. In both <u>John Alden</u> and <u>Cash</u>, however, the respective plaintiffs had similar restrictions. "[W]hether the employee has authority to commit the employer in matters that have significant financial impact" is a factor that the regulations instruct us to consider, 29 C.F.R. § 541.202(b); it is not, however, a requirement that must be satisfied to demonstrate that an employee exercises independent judgment. The regulations likewise provide that an employee's discretionary actions need not "have a finality that goes with unlimited authority and a complete absence of review." <u>Id.</u> § 541.202(c). The fact that, after engaging a potential client and arriving at a proposed agreement for a banquet, the sales managers submitted the proposal to management for approval does not, therefore, detract from the judgment that was exercised in arriving at the proposal in the first instance.[10]

---

[10] For this reason, we are not persuaded by the plaintiffs' arguments that the district court failed to consider "powerful, uncontroverted evidence," Appellants' Br. 33, in their favor in the form of the affidavit of a former supervisor, Jennifer Gullins. As with much of the plaintiffs' argument before this court, the Gullins affidavit tells the court much of what the plaintiffs did not do, but does not provide substantial assistance in determining what the plaintiffs daily activities included and whether, in performing those duties, the plaintiffs exercised discretion.

The plaintiffs rest their argument in large part on the recent decision of the Second Circuit in In re Novartis Wage & Hour Litigation, 611 F.3d 141 (2d Cir. 2010). According to the plaintiffs, Novartis establishes that the function of a court reviewing the discretion prong is to "analyz[e] all ten factors set forth in 29 C.F.R. § 541.202(b)." Appellants' Br. 36. We disagree that Novartis suggests broadly that a simple evaluation of the regulation's exemplary list of factors to be considered among "all the facts involved in the particular employment situation in which the question arises" provides a determinative answer to the ultimate question whether an employee exercises discretion. See 29 C.F.R. § 541.202(b); id. (noting that the "[f]actors to consider . . . include, but are not limited to" the ten listed items). In our view, Novartis did not suggest a new methodology; it simply emphasized that, on the facts before it, the employer had not shown that the employees exercised meaningful discretion. Although it identified the factors specifically listed in the regulation, the court went on to evaluate the specific tasks identified by the employer as discretionary and found none sufficient to warrant the application of the administrative exemption. Indeed, the preamble to the current regulations identifies a host of factors, other than those listed in the regulations themselves, that courts have found sufficient to demonstrate that employees exercise independent

-26-

judgment.[11]  We decline to impose an unnecessary rigidity on the circumstance-specific analysis called for in the regulations.

Finally, we conclude that the record firmly establishes that the matters about which the sales managers exercised discretion are matters of significance to the employer.  See 29 C.F.R. § 541.200(a)(3).  As was the case in John Alden, the sales and customer service position that each plaintiff occupied is integral to the functioning of the employers' businesses.  The sales managers were the face of the businesses to prospective clients, and the judgment that they exercised concerned how best to represent the employers and to develop a proposal that would attract the prospective clients to a contract with the venues.

In sum, the record in this case reveals that the plaintiffs exercised adequate discretion to come within the boundaries of our precedents and the guidance from the Department of Labor.  The district court properly concluded that, under the law of this circuit, the plaintiffs were exempt administrative

---

[11]  See 69 Fed. Reg. at 22144 (identifying as other relevant considerations an "employee's freedom from direct supervision, personnel responsibilities, troubleshooting or problem-solving activities on behalf of management, use of personalized communication techniques, authority to handle atypical or unusual situations, authority to set budgets, responsibility for assessing customer needs, primary contact to public or customers on behalf of the employer, the duty to anticipate competitive products or services and distinguish them from competitor's products or services, advertising or promotion work, and coordination of departments, requirements, or other activities for or on behalf of employer or employer's clients or customers").

employees.

## D. State Causes of Action

The plaintiffs acknowledge that their state law claims are "dependent upon and derivative of" their FLSA claims. Appellants' Br. 15 n.5. Our disposition of their FLSA claims on the merits resolves the state claims as well. See Cash, 508 F.3d at 686-87; Valerio v. Putnam Assocs. Inc., 173 F.3d 35, 40 (1st Cir. 1999).

## Conclusion

We conclude that the plaintiffs appropriately were classified as exempt administrative employees for the purposes of the FLSA and relevant state overtime laws. We therefore affirm the district court's entry of summary judgment on the wage claims for the defendant.

**AFFIRMED.**