# United States Court of Appeals
## For the First Circuit

No. 14-1744

GASSAN MARZUQ, et al.,

Plaintiffs, Appellants,

v.

CADETE ENTERPRISES, INC., et al.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, District Judge]

Before

Howard, Chief Judge,
Souter, Associate Justice,[*]
and Lipez, Circuit Judge.

Shannon Liss-Riordan, with whom Benjamin J. Weber, Lichten & Liss-Riordan, P.C., and Elayne N. Alanis were on brief, for appellants.
Nicholas B. Carter, with whom Maria T. Davis and Todd & Weld LLP were on brief, for appellees.
Peter Winebrake, Mark J. Gottesfeld, and Winebrake & Santillo, LLC on brief for amici curiae National Employment Law Project, Economic Policy Institute, and National Employment Lawyers Association; Audrey Richardson and Greater Boston Legal Services on brief for amicus curiae Massachusetts Fair Wage Campaign; Catherine Ruckelshaus, Anthony Mischel, National

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

Employment Law Project, Roberta L. Steele, and National Employment Lawyers Association on brief for amicus curiae National Employment Lawyers Association; and Ross Eisenbrey and Economic Policy Institute on brief for Economic Policy Institute.

———————————————

December 9, 2015

———————————————

**LIPEZ**, **Circuit Judge**.  Two former managers of Dunkin' Donuts stores in Massachusetts brought this action claiming they were improperly denied overtime pay in violation of the Fair Labor Standards Act ("FLSA").  See 29 U.S.C. § 207(a)(1).  Based on facts it deemed undisputed, the district court rejected the recommendation of the magistrate judge and granted summary judgment for the defendant employers, finding that plaintiffs were "bona fide executive[s]" excluded from the statute's overtime pay requirement.  Id. § 213(a)(1).  Our review of the law and the record persuades us that material factual disputes remain concerning the exemption's applicability to plaintiffs and, hence, we vacate the summary judgment and remand for further proceedings.

**I.**

**A. Factual Background**

In this appeal from a summary judgment, we present the facts in the light most favorable to the plaintiffs, the nonmoving party.  See Ray v. Ropes & Gray LLP, 799 F.3d 99, 112 (1st Cir. 2015).  Here we provide a brief recital of facts to set the stage for the analysis that follows.  We provide additional detail later as part of that analysis.

Plaintiff Gassan Marzuq worked as a manager at a Dunkin' Donuts store in Massachusetts from 2007 until his termination in

2012,[1] and plaintiff Lisa Chantre was a manager at another Massachusetts store from 2009 until her termination in 2010.[2] Both stores are among multiple Dunkin' Donuts franchises owned and operated by three related corporate entities -- Cadete Enterprises, Inc., T.J. Donuts, Inc., and Samoset St. Donuts, Inc. -- whose common president is John Cadete.

Pursuant to manager agreements they signed with Cadete Enterprises, Marzuq and Chantre were expected to work "**no less than** a six day, 48 hour work week."  (Emphasis in original.) Often, however, store managers work more than sixty hours, in part because they substitute for crew members who are out sick or miss a shift for other reasons.  Marzuq testified in his deposition that his regular schedule added up to sixty-six hours over six days, but that he was in fact "there all the time, seven days a week."[3]  Managers' responsibilities include calibrating the

---

[1] In addition to managing the regular store, Marzuq also managed for a period a separate drive-up kiosk that opened in 2009 at a nearby gas station.  The kiosk served a limited menu and was open only during daytime hours.  The regular store is open 24 hours, seven days a week.

[2] Chantre died after the complaint was filed, and the personal representative of her estate, Tanisha Rodriguez, was substituted as a plaintiff.  For convenience, we, like the district court, refer to Chantre as the plaintiff rather than Rodriguez.

[3] For purposes of our analysis, we must rely on Marzuq's description of his work, as there is no deposition in the record from Chantre.  She died four months before Marzuq's deposition was taken, in late November 2012.  The record also contains a deposition of Marzuq taken in November 2011, in a separate state

- 4 -

equipment to Dunkin' Donuts specifications, handling cash, keeping the store and grounds properly maintained, training and supervising the employees, periodic counting of every non-perishable item in the store, and substantial paperwork.

Marzuq and Chantre were supervised by a district manager, Aaron Dermandy, who oversaw at least seven stores during the time plaintiffs were managers. Among other duties, Dermandy determined staffing levels, arranged maintenance, and ordered the baked goods for the stores. He visited each store every week, and was involved in both the hiring and firing of crew members.

Marzuq viewed himself as "in charge" and "the captain" of his store, and his sons, both of whom worked at Marzuq's store, likewise saw him that way. Sarmad Marzuq testified that "[i]t was always expected that if [his father] wasn't around that he would be always on call," and Ahmad Gassan Marzuq reported that no one else was in charge when his father was not at the store: "If anyone had questions, we would just call my father and he usually would come in . . . [a]nd solve the problem for us."

The record, however, also contains evidence of Marzuq's difficulty in fulfilling his role as "leader of th[e] team." In addition to reporting that he worked on Sundays because his regular six-day schedule was insufficient to get the necessary work done,

---

court proceeding.

Marzuq testified that he "did not have [] time actually to be the manager as required to be a manager."  He elaborated as follows:

> I'm always on the floor 90 percent of my time, serving customers, cleaning, cleaning the outside, doing the landscaping, cleaning the papers out of the bushes, cleaning the bathroom, serving customers, covering shifts, employees that they call in, I have to cover. So really I don't have time to be 100 percent manager.[4]

He explained that he could not routinely delegate the clean-up to crew members "because you're always short on staff."  When asked about the company policy that employees take a day off, he responded: "How [are] you going to run . . . the operation with no management to take care of that location?  So you have to work."

## B. Procedural Background

Marzuq and Chantre filed this action in February 2011 seeking overtime compensation under the FLSA,[5] and the defendants filed a motion for summary judgment two years later that relied heavily on the depositions of Marzuq and Dermandy.  In recommending that the motion be denied, the magistrate judge found a genuine issue of

---

[4] At another point, Marzuq stated that he did not "spend enough time actually to be in the office or directing employees the proper way because I'm always working on the floor, if you want to say the counter, as any other employees and I'm putting a lot of -- a lot of hours on the floor."

[5] Marzuq was fired in April 2012, and he subsequently filed an amended complaint that added retaliation claims under the FLSA and state law.  The district court denied the defendants' motion for summary judgment on those claims, but the parties resolved them before trial and, hence, they are not part of this appeal.

material fact as to whether plaintiffs fell within the FLSA's overtime-pay exclusion for employees serving in a "bona fide executive" capacity.  29 U.S.C. § 213(a)(1).

As described more fully below, the district court disagreed that a jury could find in plaintiffs' favor.  It concluded that the facts in this case are "in substance indistinguishable" from those we encountered in Donovan v. Burger King Corp., 672 F.2d 221 (1st Cir. 1982) ("Burger King"), where we held that certain assistant managers were exempt from the overtime provision.  The court thus granted summary judgment for defendants, and this appeal followed.

**II.**

Before examining the district court's conclusion that Burger King "controls the disposition of plaintiffs' FLSA claims," we review the governing law and the reasoning in Burger King that led us to find the overtime exemption applicable there.

**A. The FLSA Executive Exemption**

The FLSA requires employers to pay their employees at least "one and one-half times the regular rate" for any hours worked in excess of a forty-hour workweek.  29 U.S.C. § 207(a)(1).  The overtime requirement has multiple exceptions.  The one at issue in this case excludes "any employee employed in a bona fide executive . . . capacity."  Id. § 213(a)(1).  Pursuant to regulations issued by the Secretary of Labor, an employer seeking to establish that

an employee is an exempted "executive" must show: (1) the employee's salary is at least $455 per week, (2) the employee's "primary duty" is management, (3) the employee "customarily and regularly directs the work of two or more other employees," and (4) the employee "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."  29 C.F.R. § 541.100(a) (2009).[6]  Each of these requirements must be met for the exemption to apply.

The regulations explicitly address the situation of an employee who concurrently performs exempt and nonexempt work -- i.e., one who supervises other employees while also doing non-supervisory tasks along with those subordinates -- stating that such an employee may fall within the exemption so long as the four requirements of § 541.100 listed above are otherwise met.  See id. § 541.106.  Whether an employee who concurrently performs both types of duties meets the requirements is determined on a case-by-case basis.  Id.  For example, a manager "can supervise

_____

[6] "Although the regulations merely state the Secretary's official position on how the statutes should be interpreted, a court must give them 'controlling weight unless [the court finds them] to be arbitrary, capricious, or contrary to the statute." Cash v. Cycle Craft Co., 508 F.3d 680, 683 (1st Cir. 2007) (alteration in original) (quoting Reich v. John Alden Life Ins. Co., 126 F.3d 1, 8 (1st Cir. 1997) (citing Chevron U.S.A., Inc. v. Nat. Res. Def. Council, 467 U.S. 837, 843-44 (1984))).

employees and serve customers at the same time without losing the exemption."  Id. § 541.106(b).  Hence, even a substantial overlap in the performance of non-managerial and managerial work will not disqualify an employee from the exemption if the executive duties are his or her "primary duty."  Id.

The regulations provide guidance on how to determine an employee's "primary duty," including a set of non-exclusive factors (in boldface below) to consider.  See id. § 541.700.  Because the primary duty inquiry is central to this case, we reproduce all but the introductory line of the pertinent regulation:

> (a) . . .  The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.  Factors to consider when determining the primary duty of an employee include, but are not limited to, **the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.**
> (b) The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee.  Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement.  Time alone, however, is not the sole test, and nothing in

this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

(c) Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

Id. (emphasis added). Briefly stated, the regulation explains that an employee's "primary" duty is not determined solely by the amount of time he or she devotes to the different categories of tasks -- i.e., exempt vs. nonexempt -- but on the overall character of his or her position.

## B. The Burger King Decision

In Burger King, the district court had found after a bench trial that the restaurant chain's assistant managers did not have management as their primary duty and, hence, were entitled to overtime under the FLSA. See 672 F.2d at 224. Among other tasks, the Burger King assistant managers scheduled employees, oversaw product quality, spoke with customers, trained employees, and "perform[ed] various recordkeeping, inventory, and cash

reconciliation duties." Id. at 223. However, the assistant managers also spent a substantial portion of their time -- more than 40 percent of their weekly work hours, id. at 224 -- "performing many of the same tasks as hourly employees, such as taking orders, preparing food, and 'expediting' orders." Id. at 223. The district court found that, "in the absence of the manager, the assistant manager on duty was 'de facto in charge of the store,'" id. at 225, but the court nonetheless concluded that assistant managers did not work primarily as managers as required for the FLSA overtime exemption.

In reversing, we stated that, "[i]n light of the district court's finding here that the assistant managers were 'in charge' of the restaurant during their shifts, its conclusion that they do not have management as their primary duty cannot stand." Id. at 227. We noted that employees may concurrently perform exempt and nonexempt tasks, and we observed that the regulation "makes it quite clear that an employee can manage while performing other work, and that this other work does not negate the conclusion that his primary duty is management." Id. at 226. We found applicable "the proposition that the person 'in charge' of a store has management as his primary duty, even though he spends the majority of his time on non-exempt work and makes few significant decisions." Id. at 227.

Because the issue of primary duty was the only disputed factor for certain of the Burger King assistant managers, our rejection of the district court's finding on that issue meant that those managers fell within the FLSA's "bona fide executive" exemption. Id. at 224.[7] Accordingly, we vacated the district court's judgment insofar as it ordered Burger King to pay back overtime wages to the group of assistant managers earning at least $250 per week. Id. at 229.[8]

**C. The District Court's Dunkin' Donuts Decision**

The role played by the Burger King assistant managers, as described in our decision, appears to largely coincide with the responsibilities of Marzuq and Chantre as depicted by the evidence

---

[7] This holding covered only assistant managers earning at least $250 per week. Pursuant to the regulations then in effect, the eligibility of such employees for the exemption was evaluated under a "short test" consisting of only two requirements: the employee's "primary duty" must be management, and he or she must regularly direct the work of at least two other employees. See Burger King, 672 F.2d at 223. The "long test" applicable to employees earning between $155 and $250 per week included, inter alia, a time limitation on work "not 'closely related' to their management duties" (no more than 40 percent). Id. at 223-24. As revised in 2004, and as described above, the regulations now set out a single test applicable to employees earning at least $455 per week. See supra Section A; see also Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1265-66 & n.48 (11th Cir. 2008) (explaining the shift from two tests to one).

[8] We affirmed the district court's judgment that assistant managers earning less than $250 were entitled to overtime pay because of the 40 percent limit -- under the long test -- on the amount of non-managerial work they could perform. See 672 F.2d at 228.

recounted in Section I above. Given that factual similarity, the district court unsurprisingly looked to our analysis in Burger King for guidance. The court stated that, like the Burger King assistant managers, it is "clear" that "plaintiffs were at all times 'in charge' of their respective stores," including while "serving customers like normal hourly employees." Dist. Ct. Op. at 9; see also id. at 8 (noting that "[t]he Burger King court found that an employee can still be 'managing' even while physically doing something else"). The district court also expressly invoked the FLSA regulation that provides that "employees who perform exempt and nonexempt work concurrently are not disqualified from the executive exemption." Id. at 9 (citing 29 C.F.R. § 541.106(a)).

Hence, echoing our holding in Burger King, the district court found it undisputed that plaintiffs had management as their primary duty, even though they spent "much of their time" on nonexempt work and "had little discretion to make significant decisions." Id. In addition, despite their limited authority overall, the court found that plaintiffs wielded influence over personnel decisions -- the other contested requirement for the exemption.[9]

---

[9] The parties do not dispute that plaintiffs satisfy the remaining two factors for the executive exemption. They earned at least $455 per week, 29 C.F.R. § 541.100(a)(1) (2009), and they "customarily and regularly direct[ed] the work of two or more other employees," id. § 541.100(a)(3).

Id. at 11. Accordingly, the court held that "the undisputed facts show that plaintiffs were employed in a bona fide executive capacity," and thus not entitled to overtime pay.  Id.

## III.

On appeal, plaintiffs contend that the district court failed to perform the multi-factor analysis required by the FLSA regulations to determine an employee's "primary duty" and improperly "gloss[ed] over a clear factual dispute" as to whether Marzuq was able to manage his store while also serving customers and completing other non-managerial tasks.  They further assert that the court's reliance on Burger King was misplaced, as that case involved a verdict entered after a bench trial rather than a ruling on summary judgment for which they are entitled to the benefit of favorable factual inferences.  All told, plaintiffs contend that summary judgment was improper because the evidence in the record would permit a reasonable factfinder to conclude that the overtime exemption does not apply to them.

### A. Standards of Review

We review the district court's summary judgment ruling de novo, assessing the facts in the light most advantageous to plaintiffs and also drawing all reasonable inferences in their favor.  Ray, 799 F.3d at 112.

The burden is on the employer to prove an exemption from the FLSA's requirements, Cash v. Cycle Craft Co., 508 F.3d 680, 683

- 14 -

(1st Cir. 2007), and "the remedial nature of the statute requires that [its] exemptions be 'narrowly construed against the employers seeking to assert them,'" Reich v. John Alden Life Ins. Co., 126 F.3d 1, 7 (1st Cir. 1997) (quoting Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960)); see also Hines v. State Room, Inc., 665 F.3d 235, 240 (1st Cir. 2011) (stating that exemptions must be "drawn narrowly against the employer"); Wirtz v. Keystone Readers Serv., Inc., 418 F.2d 249, 261 (5th Cir. 1969) (noting the FLSA's "dual mandates of broad coverage and narrow exemptions").

**B. Discussion**

As noted above, it is undisputed that plaintiffs meet two of the four criteria for the "bona fide executive" exemption from overtime pay: they earned more than $455, and they "customarily and regularly direct[ed] the work of two or more other employees." 29 C.F.R. § 541.100(a) (2009). We thus begin with an examination of one of the remaining requirements: that management be an exempted executive's primary duty.

**1.  Primary Duty**

Appellants argue that the district court improperly failed to consider the four non-exclusive factors listed in the governing regulation as pertinent to the primary-duty determination: "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the

relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." 29 C.F.R. § 541.700(a)(2009). They further assert that the record evidence on these factors, viewed in their favor, does not lead inevitably to the conclusion that management was their primary duty -- thus taking this case outside the scope of our holding in Burger King.

As an initial matter, we agree that Burger King is not on all fours with this case. Our analysis there rested on findings made by the district court after a bench trial, while on summary judgment we must construe the facts in plaintiffs' favor. Moreover, the reported facts in the two cases are not identical. In Burger King, for example, the district court found that the assistant managers "devoted more than 40 percent of their time to non-managerial duties," 672 F.2d at 224, while Marzuq testified that he was "on the floor 90 percent of [the] time" doing nonexempt tasks like serving customers and cleaning. The difference between performing nonexempt work most of the time -- i.e., 90 percent -- and possibly less than half the time -- i.e., "more than 40 percent" -- could be significant in evaluating whether a manager is able to perform supervisory and nonexempt tasks concurrently. At least in some settings, a nominal "manager" who spends nearly his entire shift doing the same work as his subordinates might not be able to simultaneously manage the store. See Morgan v. Family

Dollar Stores, Inc., 551 F.3d 1233, 1272 (11th Cir. 2008) (noting, in a decision affirming jury's finding that store managers did not have management as their primary duty, a distinction between managers who spent "80 to 90% of the time performing manual labor" and those who spent 60% or "'more than fifty percent'" of their time on nonexempt tasks). As discussed below, other differences also exist, including comparative pay rates.

Importantly, when an employee performs both exempt and nonexempt work, the question of primary duty "is determined on a case-by-case basis" in light of the factors specified by regulation and identified above. 29 C.F.R. § 541.106. Appellants correctly observe that the district court did not expressly examine those factors. Instead, the court treated Burger King as dispositive on the primary duty inquiry based on the court's assessment that plaintiffs indisputably were "in charge" of their stores at all times.

Notwithstanding the procedural and factual differences between the cases, Burger King does articulate a principle that is relevant here: a manager who is "in charge" when on the job "can still be 'managing' . . . even while physically doing something else," id. at 226, and may have management as his primary duty "even though he spends the majority of his time on non-exempt work and makes few significant decisions," id. at 227. However, Burger King was anchored in factual findings that the assistant managers

- 17 -

were "'in charge' of the restaurant during their shifts," id., and that they spent substantial time on managerial duties, see id. at 224. Hence, our analysis implicitly assumed that being "in charge" is not merely a label belied by the realities of the workplace. We also observed that some of the pertinent regulatory factors "quite clearly cut in favor of Burger King's contention [that the plaintiffs' primary duty was management], especially those related to freedom from supervision and a comparison of wages with other employees." Id. at 226.

Although this case resembles Burger King in certain respects, the primary duty question cannot be answered without the case-specific inquiry contemplated by regulation. Whether plaintiffs are similarly situated to the Burger King assistant managers depends both on whether they were in fact "in charge" while at their stores and whether, in the particular circumstances of this case, their being "in charge" compels the conclusion that management was their primary duty. To fully engage those issues, it is necessary to closely examine the record evidence on the factors specified in § 541.700(a) as pertinent to the primary duty determination. We thus consider each factor in turn.

**a. Relative importance of plaintiffs' exempt and other duties**

The record contains evidence that plaintiffs' managerial and non-managerial duties were both essential for the smooth

- 18 -

functioning of their restaurants.  Marzuq testified to multiple tasks that only he performed, including recordkeeping, depositing cash, calibrating equipment, and setting schedules.  In his supervisory role, he also interviewed potential employees, trained new hires, and generally oversaw the day-to-day operation of the stores.  These responsibilities reflected the expectations set in Cadete's formal employment documents, which portray the manager's duties as almost exclusively supervisory.  The "Cadete Enterprises Position Profile" lists more than two dozen managerial tasks expected of a restaurant manager, only one of which directly anticipates a manager's assistance with nonexempt tasks ("Supervise & assist in quality Customer Service").[10]  Similarly, the "Restaurant Manager Position Agreement" states that "[t]he Restaurant Manager's majority of time is spent leading the team to meet Guest expectations, recruiting, hiring, and training new crew members as required."

---

[10] The position profile states that the purpose of the restaurant manager position is to "[i]ncrease Franchise sales and profitability through proper implementation of Cadete Enterprises and Dunkin Brands policies & procedures."  The document provides that the "Primary Contributions" of a manager include: "Increase Franchise sales"; "Improve Franchise operating standards"; "Delegate tasks and ensure Restaurant Employees remain engaged"; "Ensure proper implementation of Restaurant Sanitation program"; "Properly deploy staff during peak and non-peak hours of operation"; and "Monitor and properly handle all customer complaints & concerns."

Despite the corporate emphasis on supervisory responsibilities, Marzuq's testimony permits the conclusion that, as a factual matter, his non-managerial work also was "critical to the success of the restaurant." Donovan v. Burger King Corp., 675 F.2d 516, 521 (2d Cir. 1982). The bulk of Marzuq's workweek was spent performing nonexempt work, including serving customers and cleaning. As recounted above, he reported routinely substituting for hourly employees who were sick or absent for other reasons, explaining that "every day it's a challenge." He had particular difficulty finding replacements for certain shifts -- "especially the midnight shift and the night shift on the weekend" -- and would fill those slots himself.[11] He needed to do that nonexempt work, he explained, because he rarely was fully staffed with hourly employees -- "[o]nce every five, six months." Indeed, he stated

---

[11] Marzuq testified that he regularly covered shifts when employees "call[ed] in":

> [I]f there's a call in, somebody calls in, for example, the midnight to six in the morning, I'm there. If somebody calls in six to midnight shift, I'm there. If somebody calls in in the afternoon shift, I'm there. And, of course, when they call in the morning, I'm there anyhow, so --

Marzuq stated that he also called Dermandy for assistance in finding substitutes, and Dermandy sometimes provided an employee from another store.

- 20 -

that he had no choice but to come in on Sundays -- the seventh day of his workweek -- to complete the paperwork required of him.[12]

If, contrary to their job descriptions, managers could not prioritize their supervisory duties because "quality Customer Service" demanded that they regularly perform tasks ordinarily assigned to hourly employees, a factfinder could reasonably conclude that plaintiffs' exempt and nonexempt duties were equally important to the successful operation of their restaurants. See, e.g., Morgan, 551 F.3d at 1270 (upholding jury's verdict that store managers are not exempt executives where "ample evidence supported a finding that the non-managerial tasks not only consumed 90% of a store manager's time but were of equal or greater importance to a store's functioning and success"). Hence, whether the "relative importance" of duties factor supports the overtime exemption cannot be determined without a factfinder's judgment on the impact of the plaintiffs' varied undertakings. See id. ("The jury was free to weigh the relative importance of the store managers' managerial and non-managerial duties . . . .").

**b. Amount of time spent on exempt work**

Marzuq reported that his daily managerial activity included checking calibration on the equipment for about thirty minutes

---

[12] Marzuq's son, Sarmad, testified that he "rarely" saw his father in his office or doing paperwork "because he was always on the floor with us," including afternoons and Sundays.

every morning, counting the cash at the end of the morning shift (between 11 AM and noon),[13] entering sales and cash data into the computer, and depositing money at the bank. Once a week, he also prepared employee schedules,[14] and twice a week he spent five or ten minutes placing an order for dry goods and frozen food items. In addition, he spent between ninety minutes and three hours on training when new employees were hired. More generally, he reported that he did his "office work" -- the money counting and deposit, schedules, payroll, inventories, ordering, customer count -- between 1 and 3 PM on weekdays, and from about noon to 1 or 2 PM on Saturdays, and he completed paperwork on Sunday mornings and evenings.

For Marzuq, however, those administrative tasks added up to a relatively small portion of his workweek because he estimated that he was "on the floor," supplementing the crew, for 90 percent of his work hours. Of course, working alongside the hourly employees "on the floor" does not necessarily signify that Marzuq was engaged only in non-managerial activity during those times. As explained above, the regulations contemplate the concurrent

---

[13] The regular store shifts were from 6 AM to noon, noon to 3 PM, 3 PM to 6 PM, 6 PM to midnight, and midnight to 6 AM.

[14] Although the schedules were supposed to remain largely the same from week to week, Marzuq testified that creating a schedule could "take[] a while" because of employee absences and a persistent staff shortage.

performance of exempt and nonexempt tasks.  See, e.g., In re Family Dollar FLSA Litig., 637 F.3d 508, 516 (4th Cir. 2011) ("Family Dollar") ("Thus, while [plaintiff] unloaded freight or swept the floors, she was also the manager, and no one else was directly supervising her work.").  Indeed, certain of Marzuq's managerial responsibilities would appear to be advanced by his working side-by-side with his subordinates, including coaching them and correcting their mistakes.

Nonetheless, the record contains evidence indicating that Marzuq's supervisory role was, at least at times, overwhelmed by his non-managerial tasks.  More than once, he clarified that he "tried" to exercise his managerial duties,[15] and he reported needing to do various tasks that would take him away from the customer service area of the store (cleaning the bathroom, cleaning up outside the store, landscaping) and, hence, appear inconsistent with employee supervision.  By contrast, in Family Dollar, where the appellate panel affirmed summary judgment for the employer on an FLSA overtime claim, the plaintiff acknowledged that, "while [she] performed nonmanagerial tasks around the store as she determined necessary, she concurrently performed the managerial

---

[15] For example, Marzuq was asked, "[W]hile you were in the store helping to serve customers, you continued to act in your managerial capacity, right?"  He responded: "I tried, yes." Similarly, he immediately followed up his acknowledgement that he was "the captain" of his store by noting that he "tried to be" the captain.

duties of running the store."   637 F.3d at 515-16 (emphasis omitted).[16]

The time factor is particularly complex in this case because Marzuq routinely worked far in excess of the forty-eight-hour threshold required by the Cadete manager agreement.  His regular schedule called for sixty-six hours over seven days,[17] but because he substituted for absent employees, his average workweek was seventy to eighty hours.  In addition, he acted as "captain" of the store even when he was off duty, fielding phone calls from

---

[16] The Fourth Circuit elaborated on the plaintiff's multitasking:

> As she explained, "whether or not [she] happened to be putting up stock at a given moment or running a register or talking to a customer, at the same time [she was] responsible for making sure the whole store ran successfully."  Similarly, she stated, "When [she was] running a cash register, [she was] at the same time looking at the condition of the front end and keep [sic] an eye out for theft, etc."  She explained, "When [she was] doing [her] paperwork for [her] cash registers and [her] money, [she was] thinking about what had to be done later with regard to that money and all that paperwork for that and store deliveries."

637 F.3d at 516 (alterations in original); see also id. at 517 (noting that "she testified plainly, 'I ran the store when I was in the building,' and, according to her, she was in the building most of the time, as she spent between 50 and 65 hours per week at the store").

[17] He was scheduled Monday through Saturday from 4 AM to 2:30 PM, and Sunday from 5 AM to 8 AM.  He also reported working Sunday evenings to finish his paperwork.

- 24 -

employees and going into work if necessary to resolve problems. Yet, given the competing demands routinely placed on Marzuq, a factual dispute exists as to how much of his workweek he actually was "in charge" of the store. Allocating percentages of Marzuq's work hours to exempt and nonexempt duties is thus not a straightforward calculation.

Hence, the second factor -- like the first -- does not point decisively in either direction. Cf. Donovan, 675 F.2d at 522 (affirming district court's finding, after a bench trial, that Burger King assistant managers were exempt from overtime where "[t]he record [] shows that for the great bulk of their working time, Assistant Managers are solely in charge of their restaurants and are the 'boss' in title and in fact" (emphasis added)).

### c. Freedom from direct supervision

Testimony from both Marzuq and his district manager, Dermandy, suggests that Dunkin' Donuts managers have some autonomy over the day-to-day operation of their stores, though -- like the Burger King assistant managers -- they are "unable to make any significant or substantial decisions on [their] own." Burger King, 672 F.2d at 227. Managers create weekly schedules and decide how many hours to assign particular employees, but company directors (ranked above Dermandy in the Cadete hierarchy) set the store budgets and Dermandy determines the overall staffing levels for his district's stores. Managers in all Cadete stores are expected

- 25 -

to follow uniform procedures.  Dermandy testified that the primary tools used to instruct new managers in his district are an online training course provided by Dunkin' Brands and two to eight weeks of "hands-on," in-store training, sometimes supervised by him and sometimes conducted at a Cadete "training store."  That training covers, inter alia, customer service skills, leadership, equipment calibration, scheduling, and paperwork.

Regular supervision continues throughout a manager's tenure. Dermandy spends between fifteen minutes and four hours at each store in his district each week.  He explained that his weekly agenda depends on "whether I have new managers that . . . need more attention, more of my help, whether or not certain stores are up or down in sales, whether or not they have budget concerns and about 10 million other things."  Marzuq agreed that Dermandy was at his store at least once a week, and sometimes more frequently.[18]

Store managers' authority to problem solve is limited. Dermandy's managers are required to call him if they need maintenance work they are unable to perform themselves, and he will then place the reported malfunction on a repair list for an outside maintenance person.  Managers appear to have little flexibility in resolving customer complaints.  In response to "my

_____

[18] Marzuq reported Dermandy's visits as follows: "Some weeks every day, some weeks every other day, some weeks once.  It all depends on his own schedule, and all depends on what kind of problems that I have at the store."

coffee was cold yesterday," for example, a manager may "buy" the customer a new cup of coffee, but the manager may not issue a gift card without Dermandy's approval.

The record contains inconsistent evidence on personnel decisions. For example, Dermandy stated that a store manager has authority to terminate a crew member for some reasons -- such as tardiness -- while the district manager needs to be involved for "big" issues, such as theft or verbal abuse between employees. Marzuq, however, said that Dermandy had to approve any termination, adding: "He ha[s] to know everything that's going on." Managers also need permission to hire additional crew members when they are short staffed, as well as to add an assistant manager position.

From Marzuq's perspective, managers have little independence. When asked how Dermandy supervised his work, he stated: "From every way, from the records that I send him weekly, from coming down [to] the store or from the office if he heard anything, from phone calls, from e-mails, or from showing up different times. . . . I . . . have to go through my bosses for anything that I have to do."

In sum, the record depicts a dynamic that, at least in broad strokes, appears typical for a fast-food franchise manager: limited decision-making authority, particularly when a matter involves spending money; close monitoring by an off-site superior to ensure compliance with the company's policies, practices, and

expectations; and everyday responsibility for the smooth operation of a clean, adequately staffed restaurant. This scenario is similar to our description of the circumstances in Burger King, where the assistant managers' equivalent tasks were "governed by highly detailed, step-by-step instructions contained in Burger King's 'Manual of Operating Data,' and admit of little or no variation." 672 F.2d at 223; see also Morgan, 551 F.3d at 1271 (concluding that "[s]tore managers had little freedom from direct supervision," where, inter alia, district managers "were responsible for enforcing the detailed store operating policies;" closely reviewed each store's inventory, orders, and net sales figures; monitored weekly payroll; controlled employee pay rates and raises; and "routinely sent to-do lists and emails with instructions to store managers").

The record thus shows that Dermandy closely supervised plaintiffs. On its own, this factor tends to favor plaintiffs. Burger King, however, accepted a confined level of authority as consistent with a conclusion that the assistant managers had management as their primary duty. Hence, this factor, like the two factors already discussed, does not decisively point one way or the other on the primary duty question.

**d. The relationship between plaintiffs' salaries and the wages paid hourly employees for similar nonexempt work**

The parties' combined statement of undisputed facts gives Marzuq's weekly salary as $825 and Chantre's as $600, and reports that crew members are paid $8 per hour. If, on an hourly basis, a manager's salary for performing a high percentage of nonexempt work is about the same as the wages of crew members for such work, the justification for exempting the manager from overtime pay is weakened. See generally, e.g., Donovan, 675 F.2d at 520 ("Where salary is low and a substantial amount of time is spent on non-exempt work, the inference that the employee is not an executive is quite strong . . . ."); Marshall v. W. Union Tel. Co., 621 F.2d 1246, 1251 (3d Cir. 1980) (noting that "granting managerial employees exempt status must have been a recognition that they are seldom the victims of substandard working conditions and low wages"). An accurate comparison of weekly and hourly wages necessarily depends on the number of hours attributed to the salaried employees, yet -- as described above -- it is difficult on this record to fix a number of hours worked by the managers. Taking the facts in the light most favorable to plaintiffs, however, we at a minimum must presume that Marzuq regularly worked sixty-six hours per week. Based on their salaries, that would be an hourly rate of $12.50 for Marzuq and roughly $9 for Chantre.

Two other factors also must be considered.  First, the hourly employees also received tip income, increasing their earnings by some margin.  We thus must determine how much tip income to add to the crew members' $8-per-hour base rate to make a fair comparison with plaintiffs' salaries.  The record contains evidence indicating that tips may have been as low as fifty cents per hour or as much as $2.70 per hour.[19]  In their brief, appellants propose a $2-per-hour tip estimate, which we conclude is adequately supported by the record for purposes of summary judgment.

Second, a fair comparison of wages also needs to take into account that, if managers were compensated like hourly employees, hours worked over forty would be paid at the overtime rate of time-and-a-half.  Hence, taking a sixty-six-hour workweek, compensated at $8 per hour for the first forty hours ($320) and $12 per hour for the remaining twenty-six hours ($312), supplemented by $2-per-hour in tips ($132), a non-managerial crew member would earn $764 -- significantly more than Chantre and insignificantly less than Marzuq.  See, e.g., Morgan, 551 F.3d at 1271 (describing as "relatively small" a two- or three-dollar difference between

_____

[19] Cadete assumed employees earned fifty cents per hour in tip income, but Marzuq testified that, when he shared in tips, he received roughly $180 per week in such income.  Based on a sixty-six-hour week, $180 would amount to about $2.70 per hour.  At some point during Marzuq's tenure with Cadete, the company changed its policy to prohibit managers from receiving tips.

hourly rates of salaried store managers and hourly assistant managers).

At least at this juncture, the equivalence in pay shown by this calculation means that the salary vs. hourly wages factor is squarely in plaintiffs' favor.

### e. The primary duty inquiry as a whole

As our discussion of the factors listed in § 541.700(a) demonstrates, the evidence in the record does not lead inevitably to a conclusion that, in practice, Marzuq and Chantre's primary duty was management. To evaluate at least two of the factors -- the time spent on exempt work and the wage comparison -- a factfinder would need to determine the number of hours plaintiffs regularly worked, the percentage of time they were engaged in nonexempt work, and the portion of that nonexempt time in which they were concurrently performing managerial duties. See, e.g., Reich v. Stewart, 121 F.3d 400, 404 (8th Cir. 1997) ("[T]he amount of time an employee works and the duties he or she performs present factual questions[.]").

Indeed, if a factfinder determined that plaintiffs' nonexempt duties regularly consumed more than forty hours per week,[20] and that plaintiffs did not, in fact, simultaneously perform

---

[20] Ninety percent of his scheduled sixty-six hours -- the amount of time Marzuq said he was "on the floor" -- would be about 59 hours.

managerial duties during a substantial portion of that time, a conclusion that management was plaintiffs' primary duty seems unlikely -- even if, as Marzuq testified, he spent at least another twenty to thirty hours each week on exempt work. Taken as true, the fact that Marzuq worked seven days a week, logging a minimum of sixty-six hours and often more, together with a finding that most of those hours were exclusively devoted to nonexempt work, would suggest that he effectively was doing two jobs, for one salary: a fulltime nonexempt position and a part-time exempt one. In that scenario, a reasonable factfinder might be reluctant to characterize the "part-time" managerial position as his primary duty for the company.

Moreover, such a scenario would appear to conflict with one of the principal goals of the FLSA's overtime provision: "to spread employment more widely through the work force by discouraging employers from requiring more than forty hours per week from each employee." Marshall v. Chala Enters., Inc., 645 F.2d 799, 803 (9th Cir. 1981); see also Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 578 (1942) ("In a period of widespread unemployment and small profits, the economy inherent in avoiding extra pay was expected to have an appreciable effect in the distribution of available work. Reduction of hours was a part of the plan from the beginning."), superseded on other grounds by statute, Portal-to-Portal Pay Act, 61 Stat. 84, 86-87 (1947), as stated in Trans

World Airlines, Inc. v. Thurston, 469 U.S. 111, 128 n.22 (1985); Mechmet v. Four Seasons Hotels, Ltd., 825 F.2d 1173, 1176 (7th Cir. 1987) (noting that one purpose of the FLSA overtime requirement was "to spread work and thereby reduce unemployment, by requiring an employer to pay a penalty for using fewer workers to do the same amount of work as would be necessary if each worker worked a shorter week"); "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees," 69 Fed. Reg. 22,122, 22,124, 2004 WL 865626 (Apr. 23, 2004) (hereafter "Defining and Delimiting the Exemptions 2004") (noting "the potential job expansion intended by the FLSA's time-and-a-half overtime premium").

Managers, of course, typically work more than a forty-hour week without entitlement to overtime compensation under the FLSA,[21]

---

[21] The regulations do not address executive employees whose managerial responsibilities require an extraordinary number of work hours, apparently reflecting an assumption that such employees are adequately compensated in other ways. See "Defining and Delimiting the Exemptions 2004," 69 Fed. Reg. at 22,123-24 (stating that "[t]he legislative history indicates that the . . . exemptions were premised on the belief that the workers exempted typically earned salaries well above the minimum wage, and they were presumed to enjoy other compensatory privileges such as above average fringe benefits and better opportunities for advancement"); Dep't of Labor, Wage and Hour Division, "Defining and Delimiting the Terms 'Any Employee Employed in a Bona Fide Executive, Administrative, or Professional Capacity . . . or in the Capacity of Outside Salesman,'" 46 Fed. Reg. 3010, 3016 (1981) (stating that the executive exemption "stemmed from the recognition that such personnel have special work responsibilities, compensatory privileges and benefits which are superior to those of other employees").

and the Secretary's regulations expressly reject a percentage threshold for triggering overtime pay. See 29 C.F.R. § 541.700(b) ("[N]othing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work.");[22] see also Family Dollar, 637 F.3d at 515 ("There is no per se rule that once the amount of time spent on manual labor approaches a certain percentage, satisfaction of [the time] factor is precluded as a matter of law."). Yet, the percentages may have an impact when combined with other factors. Under the regulations, managers who "spend more than 50 percent of the time performing nonexempt work such as running the cash register" would generally not fulfill the primary duty requirement if they are "closely supervised and earn little more than the nonexempt employees." 29 C.F.R. § 541.700(c).

In short, as explained above, the evidence is inconclusive on multiple factors in the primary-duty inquiry. Hence, the plaintiffs' primary duty cannot be determined as a matter of law at this stage of the case.

---

[22] The FLSA "Exemptions" provision anticipates that a managerial employee in "a retail or service establishment" will spend some time on nonexempt duties, and thus provides that exempt status should not be denied based on "the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities." 29 U.S.C. § 213(a)(1). Under the regulations, the number of nonexempt hours can exceed 40 percent so long as the employee otherwise satisfies the exemption requirements.

**2. Authority or Influence on Personnel Decisions**

The open question of primary duty means that it is unnecessary for us to address the remaining element of the "bona fide executive" inquiry: plaintiffs' role in changing the status of other employees, including hiring, firing, and promotion. The factual dispute concerning primary duty suffices to foreclose summary judgment.

## IV.

Viewing the record in the light most favorable to plaintiffs, a reasonable factfinder could conclude that defendants have failed to meet their burden of showing that Marzuq and Chantre fell within the "bona fide executive" exception to the FLSA's overtime pay requirement. Hence, we vacate the summary judgment for defendants and remand the case for further proceedings.

So ordered.  Costs to appellants.